Laeamoee, Judge,
delivered the opinion of the court: This is an action to recover Federal income taxes paid by plaintiff for the fiscal years ended June 30, 1968, 1964 and 1965. The issue presented involves the extent to which amounts paid by plaintiff during the years in question to its two principal officer-stockholders are deductible for tax purposes as reasonable compensation. The relevant facts, set forth at length in succeeding findings, are recited here in summary fashion.
Plaintiff, Charles McCandless Tile Service, is a corporation organized, existing, and doing business under the laws of the State of California. Its business is that of ceramic tile contracting, and its primary area of activity is southern California. Plaintiff’s present business is the outgrowth of a sole proprietorship owned and operated for many years by Charles S. McCandless (hereinafter frequently referred to as “Charles S.”) under the name of Charles McCandless Tile Service.
In 1955, Charles S.’s son, Charles L. McCandless (hereinafter frequently referred to as “Charles L.”) went to work full time in his father’s business. During the years 1955 through 1958, Charles S. turned over a continually increasing amount of contracting responsibility to his son. In 1959, Charles S. and his son, Charles L., formed a partnership to succeed to the business of the former proprietorship. On January 2 of that year, Charles L. purchased his interest in the partnership from his father for the sum of $28,912.17, a *111 figure equal to one-half of the book value of the business at that time. The business had been expanding for a number of years.
In June 1960, the plaintiff corporation was formed, and the business of the partnership, along with part of its assets, was transferred to the new corporation. Charles S. received 50 percent of the stock of the new corporation, while Charles L. received the other 50 percent. The business operations of plaintiff subsequent to its incorporation and during the years in question, described with great detail in the findings below, were highly efficient and extremely profitable.
During the fiscal years in suit (1963,1964, and 1965), all or nearly all of plaintiff’s stock was owned directly or indirectly by Charles S. and Charles L. McCandless. During the same period, the two officer-director-shareholders (Charles S. and Charles L.) determined the amount of compensation paid to themselves. For fiscal years 1963,1964, and 1965, respectively, father and son each received $58,500, $79,200, and $86,000 in salaries from plaintiff. Plaintiff, on its tax return for each of these years, deducted the amounts paid as reasonable compensation. The Commissioner of Internal Eevenue disallowed, as in excess of reasonable compensation, a portion[1] of plaintiff’s deduction for each year. Plaintiff paid the assessed deficiencies resulting from the disallowances and, having filed a timely claim for refund, now seeks recovery here.
Section 162(a) (1) of the Internal Eevenue Code of 1954[2] provides, in pertinent part:
There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
(1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *.
*112 The guidelines for deductibility are further delineated in Treas. Beg. section 1.162-7(a) (1954) which imparts, in conformance with the underlying statute, that:
* * * The test of deductibility in the case of compensation payments is whether they are [1] reasonable and [2] are in fact payments purely for services. [Emphasis supplied.]
See also, R. J. Reynolds Tobacco Co. v. United States, 138 Ct. Cl. 1, 149 F. Supp. 889 (1957), cert. denied, 355 U.S. 893 (1957).
It is well settled that whether compensation is reasonable for tax-deduction purposes is a question of fact which, there being no universal rule to determine the answer, must be decided on the basis of a review of all the facts in each particular case. See, Irby Gomtruction Co. v. United States, 154 Ct. Cl. 342, 290 F. 2d 824 (1961); Bringwald, Inc. v. United States, 167 Ct. Cl. 341, 334 F. 2d 639 (1964); Jones Brothers Bakery, Inc. v. United States, 188 Ct. Cl. 226, 411 F. 2d 1282 (1969); Stiening v. Commissioner, 147 F. 2d 204 (3d Cir. 1945). This court, in Irby Construction Co. v. United States, supra, described the issue under consideration there, now here, in the following language at page 346:
The inquiry as to the reasonableness of compensation in a given instance is not without some guides. At various times courts have looked to such things as the amounts paid by similar enterprises for services of a like character; the type and extent of services rendered by the employee; the scarcity of qualified employees for the position; the prior earning capacity of the employee; the peculiar characteristics of the taxpayer’s business, and the general economic conditions of the period. [Citation omitted.] * * *.
See also, 2 P-H 1970 FED. TAXES ¶ 11,611 at 11,303; Mertens, Daw of Federal Income Taxation, section 25.69 (1966).
It is also well established that the burden of proof in each case regarding the extent to which purported salary payments constitute reasonable compensation for services performed rests upon the taxpayer. See, Griffin & Co. v. United States, 182 Ct. Cl. 436, 389 F. 2d 802 (1968); Northlich, Stolley Inc. v. United States, 177 Ct. Cl. 435, 368 F. 2d 272 *113 (1966); Botany Worsted Mills v. United States, 278 U.S. 282 (1929), aff'g 63 Ct. Cl. 405 (1927); Shield Co., Inc., 2 T.C. 763 (1943).
There can be little doubt on the record here that plaintiff’s impressive net profit showing during the years in question has been due in large measure to the long experience, outstanding executive abilities, and hard work of Charles S. and Charles L. McCandless. The evidence is persuasive, moreover, that it would be extremely difficult for plaintiff to replace these two officers within any reasonable period of time. In short, the McCandlesses have played a critical role in, and are largely responsible for, plaintiff’s extremely successful operations.
The record further reveals that the payments received by the McCandlesses, when compared with nationwide averages of officers’ compensation for special trade contractors in plaintiff’s asset category, were a lesser percentage of net profits than the national average for such special trade contractors. Direct comparison of plaintiff to the “comparable” company suggested by defendant, sheds little light on the question of reasonable compensation. Indeed, the difference in certain operational aspects such as method of crew coordination and quantity of personnel, and the great disparity in net-profit-making ability, strongly support the conclusion that the Hawthorne Tile Company is not a “comparable” company for tax-aspect comparison purposes. If a comparison of the two companies indicates anything, however, it is that the McCandlesses were entitled to compensation substantially in excess of that received by their Hawthorne counterpart. Accordingly, after examining the record in its entirety, with particular emphasis upon the elements discussed above, we consider the compensation paid by plaintiff to the Mc-Candlesses during the pertinent period, in and of itself, to have been within the realm of reasonableness.
Even a payment deemed reasonable, however, is not deductible to the extent that it is in reality a distribution of corporate earnings and not compensation for services rendered. See, Irby Construction Co. v. United States, supra; Northlich, Stolley Inc. v. United States, supra; Klamath Medical *114 Service Bureau v. Commissioner, 29 T.C. 339 (1957), aff'd, 261 F. 2d 842 (9th Cir. 1958). Close scrutiny of payments is particularly warranted where, as in the instant case, a closely held corporation and its officer-stockholders are involved. See, Treas. Reg. section 1.162-7 (b) (1) (1954); Bringwald, Inc. v. United States, supra. The operative facts here reveal, in this regard, that as of June 30, 1965, plaintiff had neither declared nor paid dividends to its shareholders in any amount since its formation in 1960.[3] During each of the years in controversy, however, approximately 50 percent of net profits (before salaries and Federal income tax) was paid to the McCandlesses as compensation. We think it clear that any return on equity capital is so conspicuous 'by its absence as to indicate, given all the facts, that the purported compensation payments necessarily contained a distribution of corporate earnings within. See, Twin City Tile & Marble Co. v. Commissioner, 6 B.T.A. 1238 (1927), aff'd, 32 F. 2d 229 (8th Cir. 1929); Jacksonville Paper Co., 13 T.C.M. 728 (1954) ; Botany Worsted Mills v. United States, supra.
It is not without great difficulty that we must determine what portion of the purported compensation payments received by the McCandlesses was in reality a disguised dividend. No precise formula with which to strike a balance between compensation and investment-return commends itself to us. Nevertheless, as surely as the McCandlesses contributed substantially in their employee-roles to plaintiff’s success, it is equally clear that they were responsible also in their stockholder-roles {i.e., supplying risk capital, assuming corporate obligations, and participating in corporate decisions) for that success.
Implicit in our earlier discussion of reasonable compensation is the attitude that a corporation’s highly efficient operation and its clearly demonstrated profit-making ability justify substantial compensation to the officers responsible therefor. As such performance justifies substantial compensation, we are of the farther view that it also justifies a *115 substantial investment return. Perhaps this is especially true with respect to a closely held corporation where the opportunity to distribute corporate earnings as compensation is most readily available and, as here, compensation is in fact in proportion to the stockholdings of the principal stockholders. Accordingly, in the case at hand, an examination of the entire record leads us to conclude thait a return on equity capital equal to 15 percent of net profits (before salaries and Federal income tax) would have been reasonable and justified in each of the years under review. We hold, therefore, thatt the purported compensation payments involved in this suit were actually distributions of Corporate earnings to the extent described immediately above, and to that extent such payments were not properly deductible under section 162(a)(1).[4]
In accordance with the above, plaintiff is entitled to recover in the present action for fiscal years 1964 and 1965 only, together with interest as provided by law, and judgment is entered for plaintiff, with the amount of recovery to be determined in subsequent proceedings under Buie 131(c).
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Charles McCandless Tile Service, is a corporation organized, existing, and doing business under the laws of the State of California with its principal office in the County of Orange. Its business is that of ceramic tile contracting, and its primary area of activity is southern California.
2. On or about September 15, 1963, plaintiff filed its Federal income tax return for the fiscal year July 1, 1962 through June 30,1963, with the District Director of Internal Be venue, Los Angeles, California. In that return, plaintiff claimed a deduction from gross income pursuant to Section *116 162(a) (1) of tbe Internal Revenue Code of 1954 in the amount of $117,000 as officers’ salaries, comprised of $58,300 actually paid to its president, Charles S. McCandless, and $58,500 actually paid to its vice president, Charles L. Mc-Candless. Upon audit, the District Director partially disallowed the plaintiff’s claimed officers’ salary deduction and determined that only the aggregate sum of $102,000 was a reasonable allowance for such deduction. In making said determination, the District Director concluded that a reasonable allowance for the officer’s salary of Charles S. Mc-Candless was limited to $51,000, and a reasonable allowance for the salary of Charles L. McCandless was likewise limited to $51,000. The resulting deficiency of $7,800, plus interest of $1,194.36, was paid by plaintiff on June 6, 1966, and shortly thereafter a timely claim for refund was filed.
3. On or about September 15, 1964, plaintiff filed its Federal income tax return for the fiscal year July 1, 1963 through June 30, 1964, with the aforesaid District Director of Internal Revenue. In that return, plaintiff claimed a deduction from gross income pursuant to Section 162(a) (1) of the 1954 Code in the amount of $158,400 as officers’ salaries, comprised of $79,200 actually paid to its president, Charles S. McCandless and $79,200 actually paid to its vice president, Charles L. McCandless. Upon audit of said income tax return for fiscal year 1963-64, the District Director partially disallowed the plaintiff’s claimed officers’ salary deduction and determined that only the aggregate sum of $100,000 was a reasonable allowance for such deduction. In making said determination, the District Director concluded that a reasonable allowance for the officer’s salary of Charles S. McCandless deductible by plaintiff was limited to $50,000, and a reasonable salary allowance for Charles L. McCandless deductible by plaintiff was likewise limited to $50,000. The resulting deficiency of $29,797.11, plus interest of $2,774.80, was paid by plaintiff on June 6, 1966, and shortly thereafter a timely claim for refund was filed.
4. On or about September 15, 1965, plaintiff filed its Federal income tax return for the fiscal year July 1, 1964 through June 30, 1965, with the aforesaid District Director of Internal Revenue. In that return, plaintiff claimed a de *117 duction from gross income pursuant to Section 162(a) (1) of tlie 1954 Code in the amount of $172,000 as officers’ salaries, comprised of $86,000 actually paid to its president, Charles S. McCandless, and $86,000 actually paid to its vice president, Charles L. McCandless. Upon audit of said income tax return for-fiscal year 1964-1965, the District Director partially disallowed the plaintiff’s claimed officers’ salary deduction and determined that only the aggregate sum of $97,000 was a reasonable allowance for such deduction. In making said determination, the District Director concluded that a reasonable allowance for the officer’s salary of Charles S. Mc-Candless deductible by plaintiff was limited to $48,500 and a reasonable allowance for the salary of Charles L. McCandless deductible by plaintiff was likewise limited to $48,500. The resulting deficiency of $36,773.86, plus interest of $1,215.54, was paid by plaintiff on June 10,1966, and shortly thereafter a timely claim for refund was filed.
5. Plaintiff’s present business is the outgrowth of a sole proprietorship owned and operated for many years by Charles S. McCandless under the name of Charles McCandless Tile Service. Upon graduation from high school in 1924, Charles S. McCandless (hereinafter frequently referred to as “Charles S.”) started to work in the tile construction industry as an independent tile setter, physically setting tile in place both on jobs which he had obtained from customers and working for ceramic tile contractors on an hourly basis for brief periods.
6. In the year 1928, Charles S., together with his brother, two cousins, and other interested persons, formed a corporation called Subcontractors Inc. This corporation acted as a ceramic tile contractor, as a brick work contractor, and also sold hardware and building supplies. Charles S.’s duties for Subcontractors Inc. were those of a tile setter only.
Subcontractors Inc. was an unsuccessful business and ultimately failed at the outbreak of World War II. The failure of Subcontractors Inc. resulted in a number of unpaid creditors’ claims against the corporation for which Charles S. had no personal liability. Pie nevertheless paid all of the outstanding obligations of Subcontractors Inc. out of his own personal funds during the years following the business fail *118 ure of Subcontractors Inc. Among the creditors voluntarily paid by Charles S. was Subcontractors Inc.’s major supplier of tile, Gladding-McBean, now known as Interpace. Interpace is the major supplier of ceramic tile to all contractors in southern California.
During the years 1941 through 1943 there was no ceramic tile work in southern California to be had, and Charles S. was forced to leave his family to seek employment on various construction jobs throughout the Western United States. He worked at any job that was available, including that of carpenter and roofer.
7. In 1943 Charles S. returned to his home in Orange County to start his own ceramic tile business under his own name and with Ms own ceramic tile contractor’s license. His only capital was a small sum saved from Ms work during the war years on various construction jobs. His first business address was located in his parents’ backyard.
From 1943 until 1945 Charles S. operated as a one-man ceramic tile contractor and tile setter. He did all the work of the business himself, including estimating jobs, bidding jobs, buying materials, tile setting, billing, collections, and bookkeeping. Then, in 1945, Charles S. hired Ms first permanent employee, a young Mgh school boy named Richard G. Nunnelly, to be Ms tile setter’s helper.
Operating as a sole proprietorship, the tile contracting business of Charles S. McCandless began a steady and uninterrupted growth following World War II. Gross sales of the business during the period 1948 through 1954 were as follows:
1948 -$140, 978. 23
1949 - 123,085.49
1950 - 160,205.21
1951 - 204,240.72
1952 - 210,330.65
1953 - 291,572.62
1954 - 328,030.70
During this period all of the contracting end of the business, as opposed to the physical laying of tile, was done by Charles S. himself. Nunnelly was employed only in the capacity of journeyman tile setter.
*119 8. In 1955, Charles S. McCandless’s son, Charles L. Mc-Candless (hereinafter frequently referred to as “Charles L.”) went to work full time in his father’s business. The son’s previous experience in the tile contracting business dated back to his grammar school days. Even before Charles L. graduated from grammar school he had started a schedule of working each summer in his father’s business as a tile setter’s helper. Later, he began employment in the business as a union apprentice tile setter’s helper. He worked during the day at a regular union tile setter’s job and received union wages. However, after his regular eight-hour union day, Charles L. worked with his father three to four nights a week learning the ceramic tile contracting business by actually working with blueprints, making estimates, .and bidding construction jobs.
During the years 1955 through 1958, Charles S. turned over more and more contracting responsibility to Charles L. By the year 1958, Charles L. had worked himself into a position where he was responsible for approximately one-half of the contracting work of the business. The business continued to expand, and the gross sales of Charles McCandless Tile Service during the years 1955-1958 were as follows:
1955 _$380, 751.08
1956 _ 497,805.04
1957 _ 500,388.18
1958 _ 577,272.54
9. In 1959, Charles S. and his son, Charles L. McCandless formed a partnership. On January 2, of that year, Charles L. purchased his interest in the partnership from his father for the sum of $28,972.17, a figure equal to one-half of the book value of the business at that date. The sum was paid by Charles L. to his father over the ensuing years, apparently out of the former’s share of profits from the business. The opening balance sheet of the partnership showed an invested capital of the partners in the amount of $57,944.35.
The partnership was known under the business name of Charles McCandless Tile Service', and it succeeded to the business of the former proprietorship of Charles S. Mc-Candless. The partnership lasted for a period of 18 months, and the business continued its steady expansion. The gross *120 sales of the partnership during the 18-month period of its existence were as follows:
1959 _$760, 996.91
1960 _ 478,902.14
10. In June of I960, the plaintiff corporation was formed, and the business of the partnership, along with part of its assets, were transferred to the new corporation. Charles S. received 50 percent of the stock of the corporation (180 shares) and Charles L. received 50 percent of the stock of the corporation (180 shares) in exchange for their respective interests in the business and transferred assets of the partnership.[1] The partnership continued in operation with the assets which it retained. The opening balance sheet of the corporation showed a stated capital, after transfer of the business and part of the assets of the partnership to the corporation, of $36,000, represented by the issued 360 shares of its $100 par common stock. The immediate motivation leading to the formation of this corporation was the desire of the partners to insulate themselves from potential tort liability which might arise in the course of business operations.
11. On December 6,1960, Charles S. and Charles L. gave 18 shares of their stock of the corporation to James E. White and 18 shares to Eichard G. Nunnelly, both longtime employees. The two employees paid no consideration for this stock, the gift having been primarily motivated by the desire on the part of Charles S. and Charles L. to provide an incentive payment to White and Nunnelly in lieu of a salary increase. However, in the fall of 1964, a profit sharing trust was established for the benefit of corporate employees, whereupon Charles S. and Charles L. caused the corporation to redeem the White and Nunnelly shares for a price of $11,070 paid to each man. This redemption left Charles S. and Charles L. again as the sole stockholders, each holding 162 shares.
12. On December 22, 1964, the corporation was recapitalized, and each shareholder surrendered his 162 shares of $100 par common stock to the corporation in exchange for the *121 issuance of 162 shares of $1 par voting common stock and 3,240 shares of $1 par non-voting common stock. A few days later, Charles S. gave 428 shares of his $1 par non-voting common stock to Charles L., 428 shares of his said stock to his son, Frederick B. McCandless, 428 shares of said stock to his daughter, Lorna Jean Spivey, and 428 shares of his said stock to his daughter, Janet Ann. Gless. Then, on January 31, 1965, Charles S. gave 115 shares of his said $1 par non-voting common stock to Charles L., 115 shares of his said stock to his son, Frederick B. McCandless, 115 shares of his said stock to his daughter, Lorna Jean Spivey, and 115 shares of his said stock to his daughter, Janet Ann Gless. On the completion of these gifts, the stockholdings of the corporation were as follows:
$1 par voting stock: snares
Charles S. McCandless_ 162
Charles L. McCandless_ 162
$1 par non-voting stock:
Charles S. McCandless_1,068
Charles L. McCandless_3, 783
Frederick B. McCandless_ 643
Lorna Jean Spivey_ 643
Janet Ann Cless_ 643
13. From the date of incorporation through the close of the corporation’s tax year 1964-65, the plaintiff’s board of directors consisted of three individuals, Charles S. McCandless, Charles L. McCandless, and Bessie A. McCandless. Bessie A. McCandless is the wife of Charles S. and the mother of Charles L. She was never active in the operations of the corporate business and received no compensation from the corporation at any time.
14. Plaintiff’s business operations as a ceramic tile contractor consist of contacting to sell and install to specifications at a given contract price the ceramic tile portion of the construction of residential, commercial and industrial buildings, public'buildings, and other structures.
Nearly all of plaintiff’s ceramic tile 'business is obtained through competitive bidding against its competitors on a job-by-job basis, and, of course, plaintiff is able to obtain a profit from a given construction job of ceramic tile work only *122 if it is able to purchase and install the specified ceramic tile in that job at a cost less than its bid or contract price.
15. In obtaining and completing a given ceramic tile job, the work done by the plaintiff, and all other ceramic tile contractors, is divided functionally into the following tasks: locating work; take-off work; estimating the labor required for the installation; preparing and submitting the bid for the work; purchasing the required ceramic tile materials; scheduling the work into the construction schedule of the overall construction; inspecting the site of the work prior to commencement of the j ob of installation; delivering materials and equipment to the jobsite and directing tile setting crews to the jobsite; supervising the work of the tile setting crews on the job; inspecting the completed job; and finally billing and collection of accounts receivable.
16. Locating the work to be bid is the first step in undertaking a ceramic tile construction job. Available work is sometimes advertised in construction trade papers, or it may sometimes be brought to the notice of the ceramic tile contractor by mailed requests for bids. Sometimes available work is merely listed and kept on file at the general offices of major general contractors. To locate such available work, an employee of a ceramic tile contractor must keep a close watch on all these various sources of information.
The nest chronological step in performing a ceramic tile job after locating the work is the “take-off” of material required. After the management of the ceramic tile contractor has determined that it is interested in bidding a given job, an employee proceeds to the offices of the general building contractor and examines the job specifications pertaining to ceramic tile construction. He determines from those specifications the type of ceramic tile required and the amount of tile required for the job. This take-off work is considered by most ceramic tile contractors to be fairly mechanical consisting primarily of making arithmetic computation of square footages.
The next chronological step is estimating the labor required for the job. A management executive must take the specifications and the square footage computations from the take-off man and compute the number of man hours it will *123 take Ms crews to install the required ceramic tile. This particular function is considered by ceramic tile contractors to be one of a most delicate nature requiring a great deal of experience and ability on the part of the employee performing the work.
The next chronological step is to prepare and submit a bid to the general contractor for the job. This is done by taking the dollar cost of materials (as computed by the takeoff) and the dollar cost of labor (as computed by the estimate of labor), adding a profit factor, and computing a final bid price for the job. The profit percentage factor varies depending upon the amount of work available generally, the amount of work already contracted for by the bidder, and the competition. The final contract figure is then incorporated by an employee of the tile contractor into a written bid form and submitted to the general contractor in competition with the other ceramic tile contractors seeking the same work.
17. If Ms bid is accepted, the next action taken by a ceramic tile contractor is that of purchasing the ceramic tile materials required for the particular job. In performing this function, the ceramic tile contractor should incorporate the ceramic tile materials needed on that specific job and the projected date of the commencement of work with all his other ceramic tile materials purchase orders in such a manner as to take advantage of whatever quantity discounts the ceramic tile manufacturers may offer, at the same time, assuring a timely delivery of materials for each specific job.[2] The contractor then orders the materials from the tile manufacturer, schedules the delivery date for materials to the tile contractor’s warehouse, and sees to the warehousing of the specific tile ordered for the specific jobs scheduled.
The next chronological step in performing a ceramic tile job, after purchasing the ceramic tile materials, is to schedule the job into tire overall construction schedule of the general contractor on that job. The time of the labor crews employed by and available to the ceramic tile contractor must be coordinated into the construction schedule.
*124 The next step is to inspect tbe jobsite prior to commencement of the ceramic tile installation. An employee of the ceramic tile contractor mnst physically go to the jobsite and determine whether the area for installation is properly cleaned, cleared, and ready for ceramic tile work. This employee must also determine whether there are any special problems existing on the jobsite which must be eliminated prior to dispatching crews and materials to the site.
The next step is to deliver the materials to the jobsite. An employee of the ceramic tile contractor must physically transport to the site the necessary equipment, ceramic tile, sand, tile cement, and other essential items for use by the labor crews.
The next chronological step, of course, is to direct the labor crews to the jobsite and to instruct them as to the type of work involved, the estimated time involved, and any special problems. An employee of the ceramic tile contractor who is familiar with the job to be done must brief the tile setters and their helpers as to all specific aspects of the job and insure that they arrive on the jobsite at the proper time and in the proper numbers. As the job progresses, supervision is necessary over the work of the journeyman tile setters and their helpers in the actual installation and setting of ceramic tile as per specifications. An employee of the ceramic tile contractor must be in a position either by personal physical inspection, or by receiving reports from responsible tile setter crew chiefs, to assure the ceramic tile contractor that the job is proceeding according to schedule in a competent manner.
The next step is the final inspection of the completed job for quality control. An employee of the ceramic tile contractor, either through personal physical inspection, or through reports from responsible crew chiefs, must assure the tile contractor that the job has been completed according to specifications and is up to the quality standards of the ceramic tile contractor.
18. The last step after that of final inspection is the billing and collection of accounts. An employee of the ceramic tile contractor must send out written invoices to the general *125 contractor according to the contract under which the work was done and must follow up those invoices until the contract price is collected.
19. The internal organization of ceramic tile contracting businesses varies greatly throughout the industry. The vast majority of ceramic tile contractors, being essentially small operations, operate as a one-man production. The one-man contractor-tile setter performs all of the work functions from obtaining work through setting the tile to billing for the completed job. On the other end of the scale, in the case of a large tile company such as Selectile, each work function is assigned to a different employee. Take-off work is done by a take-off man. Labor estimating is done by an estimator. Supervisors who do no estimating, take-off work, or bidding, are employed to supervise the tile-setting crews. Truck drivers and warehousemen with no other functions are also employed, as are salesmen who do nothing but sales work.
20. During the years 1962 through 1965, plaintiff’s internal personnel organization consisted of five non-union, non-tile-setting employees. They were Charles S. McCandless, the president, Charles L. McCandless, the vice president, Bich-ard Nunnelly, James White, one office typist, and, as a part-time accountant, Fred McCandless, youngest son of Charles S. James White was employed during the years in question as a bookkeeper and office manager. His employment function was restricted to keeping books of accounts, billings, and collections. Bichard Nunnelly had been a tile setter for many years. In 1960, however, he began training for office work, and his employment function during the years in question was primarily that of take-off man, estimator, and supervisor on some of the smaller jobs undertaken by plaintiff. Nunnelly’s efforts accounted for approximately 15 percent of the gross dollar volume of the corporation during the years in question.
During those years, Charles S. and Charles L., between them, performed the remaining 85 percent of the non-direct labor contracting work of the plaintiff, including locating work, take-off work, estimating, preparing and submitting *126 bids, purchasing material, scheduling work, inspecting sites prior to commencement of jobs, delivering materials and equipment to the jobsite, directing tile-setting crews to the jobsite, supervising crews on the jobsite, and inspecting completed jobs. The duties and responsibilities of the two men during the years in question were identical, and each handled approximately the same volume of work. Except for the small jobs handled by Nunnelly,[3] either Charles S. or Charles L. had the sole responsibility for all the contracting phases of a given job. The McCandless charged with responsibility for a particular job would take it from the initial phase of obtaining the work through final inspection, in substance, acting independently of the other McCandless except for relieving each other during vacation periods.
21. During ithe years in question, the plaintiff on an average kept approximately 30 separate crews of tile setters at steady work. On some occasions there were as many as 36 crews working on various contracting jobs for the corporation at one time. Of these, Nunnelly supervised five crews at the most, and Charles S. and Charles L. supervised the remaining crews.
The typical work day of both McCandlesses during the years in question commenced at between 5:30 and 6:30 a.m., and ended at between 5:30 to 6:00 p.m. It was commonplace for both men to work at night also doing take-off work and the like. During the years in question, both men worked six days per week, Monday through Saturday. While both men were connected with other business ventures, such as an orange grove and an equipment rental company, the record does not disclose how much time they devoted to such outside interests.
22. The plaintiff’s tile contracting operations and procedures, as developed by the McCandlesses, differed in one important respect from those employed by major competitors. The difference lay in the methods used for crew coordination. All the larger tile contractors in southern California, except plaintiff, follow the procedure of coordinating the assembly *127 of crews, materials, and equipment at the jobsite itself. Under this method of coordination, crews report directly to the jobsite, materials and equipment are delivered to the jobsite by trucks driven by non-direct labor personnel, and supervisory personnel travel to the site to check progress, coordinate the work, etc.
The McCandlesses used a different method of coordination more nearly comparable to that used by a small ceramic tile contractor. Typically, the latter is a sole proprietor who has his small crew of helpers join him at his plant where materials and equipment are loaded on his truck. Then, they proceed to the jobsite and commence work.
This is the McCandless system on a much larger scale. To the extent available, each tile-setting crew is furnished one of plaintiff’s trucks. Each crew reports to plaintiff’s plant at the start of the work day. There they receive the necessary materials and equipment for the day’s work and have an opportunity to discuss the job and its problems with supervisory personnel. Then they proceed to the jobsite and are ready to start work on arrival.
23. The McCandless system is an economical operation, particularly in the saving of manpower. Less labor and supervisory personnel are required. It attracted the attention of the industry leader, Selectile, but that company was unsuccessful in efforts to adopt the system and reverted to the jobsite coordination method. No one is entirely sure as to why McCandless has been so successful in the use of its job coordination methods. Its success in this regard is probably due, in large part, to the extensive experience and long working hours of Charles S. and Charles L., as well as to their ability to retain the services of competent and trustworthy crews who take good care of the equipment and materials entrusted to their custody.
24. Based upon gross dollar volume, plaintiff ranked between sixth and seventh in size among ceramic tile contractors in Los Angeles, Orange, and Ventura counties in southern California. The following table shows plaintiff’s gross dollar volume and gross dollar volume for the entire industry in said part of southern California:
*128 Entire Year Plaintiff Entire industry (calendar) (fiscal year) industry (Orange Co. only)
1962 (June-Dee.). $27,772,600 $3,207,200
1903.... $1,210,972 46,631,746 6,663,860
1964. 1,479,046 76,879,140 9,238,110
1965. 1,441,198 100,623,465 13,875,465
25. The following table shows pertinent figures from plaintiff’s books and records for the fiscal years 1960-61 through 1964r-65, as stipulated by the parties:
(i) (2) (3) (4) (5) (6) (7) (8)
Fiscal year Total assets at "book value Gross sales Net profit before officers’ salaries and taxes[5] Net profit Earned Officers’ Federal after surplus salaries (2) income officers’ (beginning taxes salaries of year) and taxes
1960-61---[4] $36,000 $1,058,658 $151,716 $43,800 $50,564 $57,352 $(100)
1961-62.__ 93,262 1,170,644 200,728 81,000 56,758 62,969 57,252
1962-63... 156,211 1,210,972 242,477 117,000 69,748 65,729 102,221
1963-61... 221,950 1,479,045 280,246 158,400 66,843 66,002 185,950
1961-65... 287,953 1,441,198 311,768 172,000 61,346 78,421 251,953
The ratio of plaintiff’s profits (after provision for salaries but before provision for Federal income taxes) to its gross sales for the five fiscal years 1960-61 through 1964 — 65 ranged between 8.24 percent to 10.58 percent, and the average ratio for the five years was 9.88 percent.
Plaintiff’s after-tax profits on invested capital at book value for the fiscal years 1960-61 through 1964-65 expressed in percentages were:

Percent'

1960-61 159. 31
1961-62 93.25
1962-63 42.07
1963-64 22.19
1964-65 28.08
*129 26. The total compensation payments by plaintiff for its first four fiscal years were as follows:
Riscal year Employee Salary Bonus Total
1961...Charles S. McCandless. $13,800 $8,100 $21,900
Charles L. McCandless. 13,800 8,100 21,900
R. G. Nunnelly. 6,200 100 6,300
James E. White. 14,149. 14,149
79 union Members. 296,141 1,650(33) 296,796
1962..Charles S. McCandless. 18,000 22,500 40,600
Charles L. McCandless. R. G. Nunnelly_ 18,000 22,600 40,500 13.300 300 13,600
James E. White.... 13,625 2,000 16,625
Dorothy Coslett_ 4,361 160 4,521
72 Union Members_ 339,303 1,800(36) 341,103
1963..Charles S. McCandless. 24,850 33,650 68,500
Charles L. McCandless. 24.850 33,660 68,500
R. G. Nunnelly.. 15,200 300 15,500
James E. White_ 15.300 2,000 17,300
Mildred P. Duncan_ 3,852 60 3,902
77 Union Members_ 338,712 1,900(38) 340,612
1964..Charles S. McCandless. 28.850 50,350 79,200
Charles L. McCandless. 28,850 50,350 79,200
R. G. Nunnelly..— 17,000 300 17,305
James E. White... 18,065 2,000 20,066
Prod McCandless_ 2,085 . 2,080
Sheila C. Boyle.. 2,130 60 2,180
91 Union Members_ 425,112 2,150(42) 427,262
The total compensation payments by plaintiff for its fiscal year ended June 30, 1965, the year in which it redeemed the stock of Nunnelly and White, were as follows:
Profit Employee Salary Bonus sharing Total contribution
Charles S. McCandless. $36,000 $50,000 $6,416 $91,416
Charles L. McCandless. 36,000 60,000 5,416 91,416
R. G. Nunnelly. 12,300 300 1,850 14,450
James E. White. 13,792 1,000 2,076 16,867
Pred McCandless. 8,700 1,000 1,309 11,009
Sheila C. Boyle. -.-.. 4,680 50 704 6,434
98 Union Members.... 401,112 2,300(46).. 403,412
*130 27. The depreciable assets purchased by the plaintiff during its first five fiscal years were as follows:
Riscal year Description Cost
1961.Comet Station Wagon. $2,878.00
Ford.. 1,990.00
Ford F-100. 1,915.00
1964 Chevrolet Pickup. 662.00
Raleón Ranchero_ 1,897.00
1962.Falcon 4-door Sedan_ 2,195.00
1962Volkswagon_ 1,266.25
1963..Chevrolet. 496.00
Ford Pickup F-250— 2,084.00
.do. 2,076.00
Ford Flat Bed. 2,775.00
1964 — .Ford Flat Bed — . 2,796.00
Ford F-100 Pickup. 2,362.00
Ford Pickup F-350. 2,448.00
Ford Pickup F-100. 1,946.00
Mixer-. 370.40
Office Furniture ... 690.62
1065.Ford F-360. 2,242.00
.do.. 2,242.00
.do. 2,640.00
1966 Volkswagon— 1,248.06
Cessna Airplane— 9,000.00
Office Equipment.. 888.45
28. The assets reported by plaintiff in its Federal income tax returns as of the end of each of its first six fiscal years were as follows:
*131 Assets [6] 6-30-65 6-30-64 6-30-63 6-30-62 19-08-9 6-30-60
-*1 $466,894.01 60,100.00 $93,966.86 244,778.17 43,903.80 24,145.18 3,796.66 $36,000.00 $160,106.84 1 $212,980.17 $281,699.06 Totals.. $47,640.77 247,690.65 34,230.75 14,275.21 159.38 . 171,866.78 11,382.00 13,291.66 318.76 105,414.15 8,265.00 12,869.84 478.13 $86,953.05 $84,839.85 $2,206.15 125,180.10 7,083.50 14,999.59 637.50 $966.47 19,383.13 6,682.20 9,968.20 Cash.. Net Receivables. Inventories. Net Depreciable Assets. Cost of Incorporation... Loans to Shareholders..
*132 29.For the calendar years 1960 through 1965, Charles S. and Charles L. reported in their income tax returns income from the McCandless Tile partnership, and salary from the plaintiff as follows:
Year McCandless Plaintiff tile corporation partnership Total
1960_Charles S. [7] $60,037.44 $4,800.00 $64,837.44
Charles L_. 59,948.80 4,800.00 64.748.80
1961_Charles Sa-16,974.64 26,100.00 43,074.64
charles L_. 16,974.64 26,100.00 43,074.64
1962_Charles S~. 721.01 40,500.00 41,221.01
Charles 721.00 40,500.00 41,221.00
1963_Charles S_. 13,247.59 81,000.00 94,247.59
Charles L_. 13,247.59 81,000.00 94,247.69
1964_Charles S-. 7,145.81 65,700.00 72.845.81
Charles L_. 7,145.81 65,700.00 72,845.81
1965. Charles S__ 9,514.17 86,000.00 95,614.17
Charles L>. 9,514.17 86,000.00 OR K14 17
30.During the years in issue, Charles S. was president and a 50 percent stockholder of a corporation known as Orange County Equipment Company. This corporation was engaged in the business of renting and selling construction equipment, and Charles S. devoted a small part of each working day to this business. For the calendar years 1960 through 1965, he received salaries from that company in the following amounts:
1960 _$6,200.00
1961 _ 8,452.00
1962 _ 10, 000. 00
1963 _ 13, 000. 00
1964 _ 10, 700. 00
1965 _ 13, 600. 00
31.During the years in issue, Charles S. and Charles L. were partners in the partnership of McCandless-Glass Groves, which was engaged in the business of developing an orange grove.[8] For the calendar years 1963 through 1965, the. partners reported farm losses from this business as follows:
*133 Year Charles S. Charles L.
1963 $6, 458. 80 $4, 817. 70
1964 6, 524. 59 5, 006. 56
1965 19, 435. 06 16,174. 85
32. On this record, there can be no doubt that the two Mc-Candlesses contributed greatly to plaintiff’s success, and the defendant acknowledges their demonstrated expertise as ceramic tile contractors. However, neither man appeared to recognize the desirability of observing the usual corporate formalities expected of management.[9] Prior to 1964, they operated the plaintiff corporation on an informal basis. They held no formal directors’ meetings as such, nor were any minutes kept of any meetings, nor were executive salaries fixed pursuant to any formal resolutions. The two managers simply got together every few months and determined salary policies for the various non-union employees of the corporation. Because they considered there was a direct relationship between their own work and the total volume of work being handled.by the corporation, Charles S. and Charles L. thought that their compensation should be determined in reasonable relation to their efforts and the volume of work processed by them. '
It was their belief that they were paying themselves as managers of the business a fair and reasonable compensation, and that they should hold back the “earnings of the business” for purchase of equipment and buildup of operating capital. It was their further belief during the years in question, that the determination of what amounted to reasonable compensation for management personnel in the ceramic tile industry could be answered only by determining how much money the managers of the business were able to make for the business during any given operating cycle. They made no effort to obtain information regarding management compensation paid by competing tile contracting firms.
33. On August 15,1964, on the advice of the corporation’s attorney, Charles S. and Charles L. caused the corporation to *134 adopt a more formal method of tying its managerial salaries to business volume. The corporation adopted a formula for payment of base and contingent compensation to Charles S. and Charles L. Under the new formula, each McCandless was to receive a base salary of $36,000 per year regardless of business profits or volume. In addition to base compensation, the corporation agreed to pay 12% percent of gross sales between $1,000,000 and $1,500,000, 7% percent of gross sales between $1,500,000 and $2,000,000, and 5 percent of gross sales between $2,000,000 and $3,000,000 to each McCandless. The $36,000 base figure was taken from the corporation’s profit-sharing trust, which on the insistence of the Pension Trust Division of the Internal Revenue Service, provides that for purposes of trust contributions and allocations among participants, only $36,000 of each McCandless’s salary can be included regardless of their actual compensation. This salary policy was put into effect for fiscal year 1964-65 when the compensation of the two men was computed as follows:
Claries S. McCandless:
Base Salary_$36, 000
Contingent Salary- 50, 000
Total_ 86,000
Charles L. McCandless:
Base Salary- 36,000
Contingent Salary_ 50, 000
Total 86,000
The computation of “contingent salary” was made as follows: Gross sales of $1,441,198X12.5%=$55,150. The difference between the $55,150 formula figure and the $50,000 contingent compensation figure paid was made up by a contribution of $5,400 each by the corporation to the profit-sharing trust for the vested account of each McCandless.
34. The percentage relationship between total officers’ salaries paid to Charles S. and Charles L. to gross sales of the plaintiff during the years in question was the following:

Percent

1960-61 4.14
1961-62 6.92
1962-63 9.66
1963-64 10.68
1964-65 14.41
*135 35.The percentage relationship between total officers’ salaries paid to Charles S. and Charles L. to the plaintiff’s net income before payment of officers’ salaries and before provision for Federal income tax during the years in question was the following:

Percent

1960-61 28.87
1961-62 40.35
1962-63 48.25
1963-64 58.07
1964r-65 52.92
36. As of June 30, 1965, the plaintiff had not paid dividends to its shareholders in any amount since its formation in 1960. The net profits during these years were simply left in the corporate surplus.[10]
37. As previously stated, in each of the years hi issue, the Commissioner of Internal Revenue disallowed as a deduction from plaintiff’s gross income, a portion of the amounts paid by it to each of the McCandlesses. For purposes of convenience, the following table summarizes the amounts paid as compensation by plaintiff to each of its officers and the amounts thereof disallowed by the Commissioner of Internal Revenue as being unreasonable:
Total Total Total amount amount amount paid disallowed allowed
Charles S. McCandless., $58,500 $7,500 $51,000
Charles L. McCandless. 58,500 7,500 51,000
Total-117,000 15,000 102,000

196/¡.

Charles S. McCandless. 79,200 29,200 60,000
Charles L. McCandless. 79,200 29,200 50,000
Total-158,400 58,400 100,000
1085
Charles S. McCandless. 86,000 37,500 48,600
Charles L. McCandless. 86,000 37,500 48,500
Total-172, 000 75,000 97,000
*136 38. In any case involving the question of whether salaries paid are reasonable in amount, a highly relevant factor is an examination of the amount of compensation ordinarily paid for “like services by like enterprises under like circumstances.” Treas. Keg., Sec. 1.162-7 (b) (3). As will appear below, such “comparison evidence” as is presented by the record in this case leaves much to be desired. However, both parties did adduce some evidence in this respect.
39. The plaintiff offered expert testimony by George N. Lavenburg, the managing director of the Ceramic Tile Institute of Southern California. The Institute is a trade association organized for the purpose of promoting the use of tile and conducting educational programs for the construction industry. Lavenburg has been its director since 1960, and prior to that time he had been a ceramic tile contractor in Los Angeles for many years. He has a broad, general knowledge of the ceramic tile business in southern California, including specific knowledge of plaintiff’s method of operation. He testified that plaintiff’s method of crew coordination at the plant, instead of at the jobsite, was unique among the larger tile contractors. He was familiar with the duties performed by Charles S. and Charles L. McCandless, both of whom he considered to be among the “top contractors in the industry.” That the two men alone could handle 85 percent of plaintiff’s total jobs he found to be far above average. In his opinion, a competitor with comparable volume would have as many as five officials performing the same work. Plaintiff’s consistently high profits “amazed” him, and he knew of no other tile contractor who could match them. Because of the demonstrated profit-making ability of Charles S. and Charles L. McCandless, and because of his belief that their services were indispensable to, and irreplaceable by, plaintiff, Mr. Lavenburg’s opinion was that the salaries paid to each officer were reasonable.[11]
40. The plaintiff also presented comparison evidence drawn from the Source Boole of Statistics of Income, published by the Commissioner of Internal Kevanue, as required by sec *137 tion 6108 of tbe 1954 Code, for the fiscal years 1963-64 and 1964^-65. This evidence is in the form of statistical averages computed from financial data taken from the corporate income tax returns of “special trade contractors” which is plaintiff’s tax category. Such special trade contractors are broken down into groups measured by the size of their total assets. The plaintiff’s total assets in 1963-64 were $287,953 and in 1964-65 were $344,235. Therefore, the statistical group in the Source Booh covering plaintiff’s category in ¡both fiscal years is the $100,000 to $500,000 total asset category. Comparisons of plaintiff’s statistical data with the statistical averages show the following:
Year Percentage Average McOandless difference
(a) Annual gross sales:
1963-64. $538,063 $1,479,045 274%
1964-65-. 901,847 1,404,198 159.8%
(b) Net profit (before payment of officers’ salaries and Federal tax): 1963-64.. $34,483 $242,477 812.7%
1964-65. 59,511 311,768 523.9%
(c) Officers’ salaries paid: 1963-64. $25,435 $158,400 622.7%
1964-65. 35,633 172,000 484%
(d) Net lneomeafter payment of salaries and before tax: 1963-64... $9,048 $121,845 1,346.7%
1964-65. 23,978 139,768 682.9%
(e) Federal income tax paid: 1963-64.. $4,342 $66,284 1,286.1%
1964-65-. 6,811 61,346 900.7%
(f) Percentage of net profit (before officers’ salaries and Federal tax) paid to officers as compensation forservices: 1963-64. 73.76% 67.07% (16.69%)
1964-65.. 59.71% 52.92% (6.79%)
(g) Percentage of dividends paid to net profit (before officers’ salaries and Federal tax): 1963-64. 3.44% Zero 3.44%
1964-65. 7.94% Zero 7.94%
41. The defendant, in turn, presented the testimony of Roger M. Guelff, president of Hawthorne Tile Company, for the purpose of showing Hawthorne’s comparability to plaintiff and the similarity of Guelff’s duties to those of Charles S. and Charles L. McCandless. Hawthorne was incorporated in 1957, and since that time Guelff has been the sole stockholder in the company. Figures on Hawthorne for *138 the calendar years 1962 through 1965 as compared to plaintiff show:
Year Hawthorne Plaintiff
(a) Gross sales: 1962. .. $709,000 $1,170,644
1963.— 1,300,000 1,210,972
1964. 1,206,000 1,479,045
1965. 998,600 1,441,198
(b) Net profits before allowance lor officers' salaries and before payment of Federal income taxes: 1962. 33,928 200,728
1963. 74,837 242,477
1964.-. 103,836 280,245
1965.-. 71,165 311,768
(e)Net profit after payment of officers’ salaries and before payment of income tax: 1962. 12,908 119,728
1963 — .-... 47,192 125,477
1964. 73,836 121,845
1965. 43,645 139,768
(d) Total assets (book value) at commencement of tax year:
1962. 146,000 93,252
1963. 196,000 156,221
1964. 229,784 221,950
1985. 245,281 287,953
(e) Ratio of net earnings after officers’ salaries and before payment of income tax to gross sales expressed in percentages:
3962. 1.8% 10.23%
1963.- 3.3% 10.36%
1964. 6.12% 8.24%
3965. 4.37% 9.70%
(f) The total number of employees of Hawthorne and plaintiff during the years 1962-1965 were as follows: 1962. 108 77
1963..-. 128 82
1964. 108 97
1965. 107 104
Year Hawthorne Percent of Plaintiff Percent of salary gross sales salaries gross sales (1 officer) (2 officers)
(g)Total officers' salaries and percentage relation thereof to gross sales:
1962. 21,020 2.96% 81,000 6.92%
1963. 27,645 2.13% 117,000 9.66%
1964. 30,000 2.48% 158,400 10.68%
1965. 27,520 2.76% 172,000 14.41%
42. There are some similarities between Hawthorne and plaintiff. Both are licensed ceramic tile contractors doing business in the same geographical area and obtaining most of their work by competitive bidding. The officer personnel of both companies perform generally the same functions of locating work, take-off work, estimating, bidding, purchasing *139 materials, scheduling work crews, and supervising and inspecting tbe work. Both have reliable hardcore work crews. During the years involved, gross sales and total assets of the two companies were reasonably comparable. Both companies are closely held corporations.
At this point, however, all similarity ceases. There is a striking difference between the two companies in their respective abilities to make net profits both before and after payment of officers’ salaries and Federal income taxes. For ex-, ample, Hawthorne’s total net profits before taxes for the four-year period 1962-1965 were $177,581; plaintiff’s total profits for the same period were $506,818. In addition, plaintiff was able to earn these substantially greater profits with considerably less personnel than that employed by Hawthorne. While the general duties of the officers were similar in both companies, their methods of crew coordination differed. See finding 22, supra.
On this record, it is concluded .that the similarities between Hawthorne and plaintiff are far outweighed by important dissimilarities. Accordingly, they cannot be considered comparable companies.
43. The defendant also presented expert testimony by a management consultant, John W. Jolders. Mr. Jolders has conducted many job evaluation surveys for numerous clients and has had extensive experience in the evaluation and administration of personnel matters, including specifically wage and salary administration.
In forming his opinion that the salaries paid by plaintiff to 'Charles S. and Charles L. McOandless were unreasonably large, Mr. Jolders called upon 'his broad experience as a management consultant, and his study of the work performed and results obtained by Mr. Guelff for Hawthorne as compared with the work performed and results obtained by the McCandlesses for plaintiff. He also used the statistical study published by the Internal Revenue Service[12] (see finding 40, supra) and executive compensation surveys published by the American Management Association.
*140 From these studies, Mr. Jolders concluded (1) that it was unreasonable for the Internal Revenue Service to decrease the annual salary allowances for the McCandlesses in the face of plaintiff’s steadily increasing- net profits, and (2) that a reasonable compensation for each of plaintiff’s officers would be within the following limits:
Minimum Maximum Tear Compensation Compensation
1962-63 $36, 500 $48, 500
1963-64 43, 000 57, 500
1964-65 43, 500 57, 750
ULTIMATE FINDING
44, Based upon the foregoing, it is concluded that 15 percent of net profits before officers’ salaries and Federal income tax for each of the years under review represented a distribution of corporate earnings. Accordingly, such amounts should have been deducted from the purported compensation payments in order to arrive at the proper deduction attributable to reasonable compensation for services rendered. The appropriate figures are reflected in the following table:
Salary distribution. Salary Year deduction of corporate deduction claimed earnings allowable (rounded off)
$117,000 $36,372 $80,628 1962-63.
168,400 42,037 116,363 1963-64..
172,000 46,765 126,235 1964-65..
CONCLUSION OF LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover for fiscal years 1964 and 1965 only, together with interest as provided by law, and judgment is entered to that effect. The amount of recovery will be determined in accordance with Rule 131 (c).
In accordance with the opinion of the court, a memorandum report of the commissioner as to the amount due and a stipulation of the parties, it was ordered on May 22, 1970, that judgment for plaintiff be entered for $23,418.11, together with interest as provided by law.

 The total amounts so disallowed by the Internal Revenue Service were as follows: $15,000 of the $117,000 purported compensation paid for 1963; $58,400 of the $158,400 purported compensation paid for 1964; and $75,000 of the $172,000 purported compensation paid for 1965. See also finding 37, infra.

 All citations to Code sections hereinafter are, unless otherwise indicated, in reference to the Internal Revenue Code of 1954.

 while plaintiff’s retention of net profits (after salaries and Federal income taxes) during the years in issue appears to reflect conservative business policies of building up operating capital reserves, only a small percentage of such retained profits was actually utilized for capital expenditures. See findings 25, 27, and 36, and findings footnote 10, infra.

 The breakdown of total purported compensation payments for each of the disputed years Into properly deductible salaries and corporate distributions of earnings, respectively, is as follows: $80,628 and $36,872 for 1963; $116,363 and $42,037 for 1964; and $125,235 and $46,765 for 1965. See also finding 44, infra.

 The shares of stock were not issued by plaintiff until August 16, 1960. During the interim period, the partners held plaintiff’s promissory note for $36,000 which note was canceled upon issuance of the stock.

 In this connection, Charles S. testified that the quantity discounts werq virtually plaintiff's profits,

 Even some of these were checked over by Charles S. or Charles L., particularly with regard to Nunnelly’s labor estimates.

 As previously noted, not all partnership assets were transferred to the new corporation upon its organization. See finding 10, supra.

 The references are to salaries of Charles S. and Charles L. and to Federal income taxes.

 Plaintiff owned no real estate. It leased the building and tile shop which it occupied during the years in question from Charles S. at an annual rental of $3,000 for fiscal years 1961 through 1964 and for $7,620 for fiscal year 1965.

 These amounts reported as income from the partnership were not apportioned between the pre-June 30, 1960, income from the partnership business and the amounts collected after June 30, 1960, from the partnership accounts receivable retained by the partners.

 The partners borrowed $60,000 from plaintiff to invest in this business. The notes evidencing the loan were non-interest bearing, payable on demand, and fully secured.

 The failure to do so is not uncommon in the case of closely held corporations, such as plaintiff, where the shareholders are also the directors and officers.

 Charles S. erroneously referred to this retention of net profits as a “plow-back.” Actually, the retention appears to have reflected conservative, policies of building up operating capital reserves for use in the purchase of new equipment, material supplies, and the like.

 Mr. Lavenburg's testimony was not based upon specific information or figures obtained from comparable companies. His information was of a generalized nature and came mostly from exchanges of ideas in Institute committee meetings and during luncheon conversations.

 In this connection, however, it should be noted that he used statistics drawn from the wrong total assets category. He used the category of $500,000 to $1,000,000 whereas, in fact, plaintiff was in the $100,000 to $500,000 category.