PAUL E. KUMMER REALTY CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Paul E. Kummer Realty Co. v. Commissioner
Docket No. 8031-70.
United States Tax Court
T.C. Memo 1974-44; 1974 Tax Ct. Memo LEXIS 276; 33 T.C.M. (CCH) 209; T.C.M. (RIA) 74044; February 20, 1974, Filed. Martin A. Rosenberg, for the petitioner. John B. Turner and James E. Cannon, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFEE, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended March 31, 1967, in the amount of $25,439.21. The only issue for decision is whether payments made by the petitioner corporation to Paul H. Kummer and Edgar H. Kummer, two of its officers, as compensation in the taxable year ended *277 March 31, 1967, in excess of amounts allowed by the respondent, constituted reasonable compensation deductible by the corporation under section 162(a) (1)[1] for personal services actually rendered. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Paul E. Kummer Realty Co. (hereinafter sometimes referred to as either the petitioner or the corporation) is a Missouri corporation, which had its principal place of business in St. Louis, Missouri, at the time it filed its petition in this proceeding. Petitioner filed its Federal income tax returns with the district director of internal revenue at St. Louis, Missouri, for the taxable year ended March 31, 1967. It has utilized the accrual method of accounting since 1957. During the year at issue, and in preceding and subsequent years, the petitioner was engaged in the business of selling real estate on its own account and for others, land development, selling insurance, managing rental property for itself and *278 others, making arrangements for loans, and preparing income tax returns. Paul H. Kummer and Edgar H. Kummer are sons of Paul E. Kummer. From 1957 to 1965, Paul E. Kummer was president of the corporation, Paul H. Kummer was vice-president, and Edgar was secretary-treasurer. After 1965, Paul E. Kummer was made chairman of the board, while Paul H. Kummer advanced to the position of president and treasurer, and Edgar became vice-president and secretary. All of the outstanding stock of the corporation since its incorporation has been owned by the three Kummers in varying proportions. It has been the custom of the corporation to pay bonuses to its three officers each year in addition to their regular salaries. Shown on the following schedule are the salaries and bonuses paid to the three officers and their respective percentage ownership of the corporation's stock during the period from the fiscal year ended March 31, 1954 through March 31, 1971: FYE 3/31
PAUL E. KUMMER
PAUL H. KUMMER
EDGAR H. KUMMER 1954
Salary
$ 7,420.00
$ 7,420.00
$ 7,420.00
Bonus
4,303.37
4,303.37
4,303.37
Total
11,723.37
11,723.37
11,723.37
% Stock
54%
23%
23%
1955
Salary
$ 7,280.00
$ 7,280.00
$ 7,280.00
Bonus
4,374.59
4,374.59
4,374.59
Total
11,654.59
11,654.59
11,354.59
% Stock
54%
23%
23%
1956
Salary
7,280.00
7,280.00
7,280.00
Bonus
8,359.21
8,359.21
8,359.21
Total
15,639.21
15,639.21
15,639.21
% Stock
54%
23%
23%
1957
Salary
7,280.00
7,280.00
7,280.00
Bonus
2,592.83
2,592.83
2,592.83
Total
9,872.83
9,872.83
9,872.83
% Stock
54%
23%
23%
1958
Salary
$10,400.00
$10,400.00
$10,400.00
Bonus
--
--
--
Total
10,400.00
10,400.00
10,400.00
% Stock
54%
23%
23%
1959
Salary
10,400.00
10,400.00
10,400.00
Bonus
4.96
4.96
4.96
Total
10,404.96
10,404.96
10,404.96
% Stock
48%
26%
26%
1960
Salary
12,010.00
12,010.00
12,010.00
Bonus
5,450.56
5,450.56
5,450.56
Total
17,460.56
17,460.56
17,460.56
% Stock
42%
29%
29%
1961
Salary
11,960.00
11,960.00
11,960.00
Bonus
281.86
281.86
281.86
Total
12,241.86
12,241.86
12,241.86
% Stock
36%
32%
32%
1962
Salary
12,810.00
12,810.00
12,810.00
Bonus
1,020.27
1,020.27
1,020.27
Total
13,830.27
13,830.27
13,830.27
% Stock
36%
32%
32%
1963
Salary
14,560.00
14,560.00
14,560.00
Bonus)
291.76
291.76
291.76
Total
14,851.76
14,851.76
14,851.76
% Stock
30%
35%
35%
1964
Salary
$14,560.00 $14,560.00
$14,560.00
Bonus
511.64
511.64
511.64
Total
15,071.64
15,071.64
15,071.64
% Stock
24%
38%
38%
1965
Salary
15,790.00
15,790.00
15,790.00
Bonus)
12,415.79
12,415.79
12,415.79
Total
28,205.79
28,205.79
28,205.79
% Stock
18%
41%
41%
1966
Salary
17,160.00
17,160.00
17,160.00
Bonus
3,731.98
3,731.98
3,731.98
Total
20,891.98
20,891.98
20,891.98
% Stock
15%
42.5%
42.5%
1967
Salary
4,295.00
17,960.00
17,960.00
Bonus
8,182.13
32,728.51
32,728.51
Total
12,477.13
50,688.51
50,688.51
% Stock
11%
44.5%
44.5%
1968
Salary
5,200.00
17,160.00
17,160.00
Bonus
509.42
2,037.65
2,037.65
Total
5,709.42
19,197.65
19,197.65
% Stock
7%
46.5%
46.5%
1969
Salary
5,400.00
20,690.00
20,690.00
Bonus
--
4,587.14
4,587.14
Total
5,400.00
25,277.14
25,277.14
% Stock
3%
48.5%
48.5%
1970
Salary
3,480.00
24,165.00
24,165.00
Bonus
--
356.91
356.91
Total
3,480.00
24,521.91
24,521.91
% Stock
3%
48.5%
48.5%
1971
Salary
--
29,715.00
29,715.00
Bonus
--
768.13
768.13
Total
--
30,483.13
30,483.13
%Stock
--
50%
50%
TOTAL
$219,315.37
$342,417.16
$342,417.16
AVERAGE
12,184.19
19,023.18
19,023.18
*279 The increase in officers' compensation during the fiscal year ending in 1956 over the preceding year was attributable to the completion of the second project of the corporation preceding the development of the Ridgeline Manor subdivision. The decline in compensation the succeeding year was due to the commencement of the subdivision. The increases in compensation during the fiscal years ending in 1960 and 1964 were attributable to the sales of lots in the first and second sections of the subdivision, respectively. The increase in the fiscal year ending in 1965 was largely attributable to the receipt of real estate commissions in the amount of $54,118.53 by the petitioner upon the sale of a large tract of land, proceeds from the sale of 37 subdivision lots in the amount of $30,983.52, and interest income of $25,382.38. The average compensation paid to Paul H. Kummer and Edgar Kummer for the fiscal years ended March 31, 1954 through March 31, 1966, was $14,788.37 each. The average compensation paid to each of them over the 15-year period beginning in the fiscal years ended in 1954 through 1968 was $17,475.66. The average compensation paid each of these officers during the corporation's *280 taxable years ending in 1965, 1966, 1968 and 1969 was $23,393.14. Paul E. Kummer began giving his shares of stock in the corporation to his sons in 1959 and had disposed of all of his shares in this manner by 1971. Starting with the fiscal year ended on March 31, 1967, the salaries paid to each of the Kummers were not the same. Each officer's compensation, the percentage of each officer's salary to the total compensation paid by the corporation to its officers, and each officer's percentage of stock ownership for the petitioner's taxable years ended March 31, 1967 through 1971 were as follows: FYE 3/31
PAUL E. KUMMER
PAUL H. KUMMER
EDGAR H. KUMMER 1967
Compensation
$12,477.13
$50,688.51
$50,688.51
% of Total
10.96%
44.52%
44.52%
% Stock Ownership
11.0%
44.50%
44.50%
1968
Compensation
5,709.42
19,197.65
19,197.65
% of Total
12.94%
43.53%
43.53%
% Stock Ownership
7.0%
46.5%
46.5%
1969
Compensation
5,400.00
25,277.14
25,277.14
% of Total
9.66%
45.17%
45.17%
% Stock Ownership
3.0%
48.5%
48.5%
1970
Compensation
3,480.00
24,521.91
24,521.91
% of Total
6.62%
46.69%
46.69%
% Stock Ownership
3.0%
48.5%
48.5%
1971
Compensation
--
30,483.13
30,483.13
% of Total
--
50%
50%
% Stock Ownership
--
50%
50%
*281 The officers' salaries and bonuses for the ensuing year were determined in May of each year by the Kummers at the annual meeting of the board of directors. The board of directors based its decision as to each individual officer's compensation upon the amount of effort expended by the officer in behalf of the corporation and whether such effort was profitable or not. From 1947 to May 10, 1966, the corporation's bonus plan provided for the payment of 20 percent of the company's net profit before taxes to each officer if the company's income exceeded at least $15,000. The corporate minutes indicate that bonuses were paid to the officers "in order to encourage [them]…in their desire and efforts in the promotion of the business and welfare of the said corporation." From 1954 to 1960, the efforts expended on behalf of the corporation by each of the officers and the value of their services were equal. After 1960, Paul E. Kummer did not devote as much time and effort to the operation of the business, but his experience and the consultation offered by him to his sons proved equivalent in value to the services performed by the sons for the corporation through the taxable year 1967. *282 The corporation embarked upon its third and largest real estate development venture, the Ridgeline Manor subdivision, in 1954 with the purchase of 55 acres in an area in North St. Louis County subsequently incorporated into a city named Black Jack. The tract was located approximately a mile and a half north of Interstate Highway 270.The total cost of the raw, rural land was $57,000. With the exception of a five-acre portion which was mostly zoned commercial, the 55 acres were divided into four sections and developed section-by-section over a 10-year period of time from 1954 to 1964. A rezoning of an entire six square-mile area, of which the 55 acres was only a part, was initially required since the Kummers could not obtain "spot zoning" for their project. Together with another realty company, the Kummers sought signatures of residents in the area for petitions in order to change the zoning from one acre to one-half acre residential lots. The zoning changes were approved by county authorities. The Kummers then drew up a subdivision plan and sought bids from contractors relating to the construction of streets, sanitary sewers, grading, and the staking out of electrical poles. *283 They also arranged for the gas, water, and electrical connections for the subdivision together with the easements required to provide the subdivisions with these utilities. a Additionally, the Kummers formulated trust indentures for the subdivision. Six homes were constructed by the Kummers to serve as models for the projected development. Numerous residential subdivisions were constructed in the general area around Ridgeline Manor by others during the period from 1954 to 1967. Edgar Kummer devoted approximately 60 percent of his time to the subdivision's development and 40 percent to the general business of the corporation, which included rentals and sales, bookkeeping, supervision of clerical employees, and management of the corporation. His brother, Paul H. Kummer, devoted 40 percent of his time to the subdivision and 60 percent to the insurance and real estate activities of the corporation. Edgar Kummer often worked 70 to 80 hours a week because of the project. Both he and his brother Paul spent numerous evening and weekend hours on the subdivision. During the development of the project, Edgar spent less than the usual amount of time with his family and would often *284 have to forego vacations with his family while construction was in progress. Edgar was on the site overseeing the various improvements at least three times during the day. Two problems arose which served to delay completion of the tract. In order to put in the sewers, it was necessary to tunnel under the streets of the first section while avoiding the water lines because both of these had previously been laid. In order to convince the gas company to run lines into the development, Edgar had various conversations with gas company representatives over a two-year period of time. After the gas line was finally completed, the Kummers were required to contact the owners in the new development in order to secure their agreement to connect the lots with the subdivision gas lines. On two separate occasions, the Kummers also had to contact all of the lot owners in order to secure amended deed restrictions. Only the three Kummers were involved with selling unimproved lots in the subdivision. The corporation employed two salesmen, one full-time and the other part-time, to handle the sales of the six homes which were constructed. Between the fiscal years ended March 31, 1957 and March 31, 1969, 91 *285 lots in Ridgeline Manor were sold. The corporation's Federal income tax returns reflected the following profits from the sales of the lots: FYE March 31
No. of Lots Sold
Profit 1957
1
$ 1,194.43
1958
0
0.00
1959
2
2,320.93
1960
7
5,016.07
1961
6
5,661.51
1962 3
4,040.43
1963
5
6,096.88
1964
13
18,625.68
1965
37
30,983.52
1966
15
12,212.51
1967
0
0.00
1968
1
(241.34)
1969
1
121.00
Total
91
$86,031.62
At the corporation's board of directors' meeting on May At the corporation's board of directors' meeting on May 10, 1966, there was a lengthy discussion by the three Kummers relating to the proper allocation of the projected bonus for the current fiscal year. It was decided that each of the sons would be entitled to 33-1/3 percent of the corporation's net profits before taxes and that 8-1/3 percent would be allocated to their father provided that the income of the corporation exceeded $15,000. The percentage of the corporation's net profits allocated to officers' bonuses was thereby increased from 60 percent in the preceding years to 75 percent in the taxable year ended March 31, 1967. No other employees, such as clerical *286 personnel and salesmen, have ever been granted bonuses pursuant to a bonus agreement. At the time of the board meeting, the officers knew that the five-acre commercial tract in the Ridgeline development would probably be sold since a sales option contract had been executed less than a month before. For the taxable years ended March 31, 1957 through March 31, 1971, the corporation's Federal income tax returns reflect the following gross income, taxable income, officer-shareholders' compensation, taxes paid and earned surplus or unappropriated retained earnings: FYE 3/31
Gross Income
Taxable Income
Officer-Shareholders' Compensation
Taxes Paid
Earned Surplus 1957
$ 55,354.69
$ 5,094.97
$ 29,618.49
$1,528.49
$ 61,454.71
1958
49,128.59
(2,714.19)
31,200.00
0.00
58,740.52
1959
53,192.46 9.73
31,214.88
2.92
59,550.12
1960
87,148.48
10,671.48
52,381.68
3,201.44
67,020.16
1961
62,562.40
536.76
36 ,725.58
161.03
67,395.89
1962
70,230.06
1,991.70
41,490.81
597.51
68,790.08
1963
68,961.02
569.53
44,555.28
1 70.86
69,188.75
1964
85,347.95
989.53
45,214.92
215.61
70,169.31
1965
146,701.33
24,191.10
84,617.37
5,222.32 89,138.09
1966
103,676.82
7,272.96
62,675.94
1,570.44
94,840.61
1967
177,884.11
24,300.92
113,854.15
4,842.31 114,299.22
1968
92,116.23
1,488.10
44,104.72
269.76
115,517.56
1969
116,870.50
581.28
55,954.28
0.00
116,090.70
1970
136.696.34
706.68
52,523.82
26.99
117,031.88
1971
150,487.78
1,520.90
60,966.26
338.77
118,214.01
*287 No dividends of any kind have been declared or paid by the petitioner since its incorporation. The total of the corporation's accounts payable, notes payable, and deeds of trusts payable, shown as liabilities on the corporation's balance sheets for its fiscal years ended March 31, 1956 through 1967 averaged approximately $350,000. On its income a tax return for the taxable year ended March 31, 1967, petitioner's mortgages, notes, and bonds payable in less than one year totaled $245,467.64; its long-term mortgages, notes, and bonds payable totaled $234,772.67. No loans from stockholders were reflected on the return. The corporation's net worth increased from $84,697.63 for its fiscal year ended March 31, 1957, to $137,542.14 for its fiscal year ended March 31, 1967. The gross income of the corporation for the taxable year ended March 31, 1967, consisted of the following: Discount and fees
$ 8,891.53
Income received on income tax returns
4,353.50
Income received as insurance commissions
27,525.99
Net income earned on deeds of trust
13,788.42
Commission on real estate loans
6,066.30
Commission on real estate sales
5,848.87
Commission on collection of rents
3,027.42
Notary fees
82.00
Recording fees
43.95
Rental Collections
(859.32)
Ridgeline Manor water refunds
2,292.75
Sale of copy machine
100.00
Proceeds received on sale of commercial tract
106,722.70
Total income
$177,884.11
*288 The five-acre commercial tract was not improved in the same manner as the residential acreage. However, a portion of the tract was graded, a pond was filled in and leveled, some barns and sheds were removed, and the tract was cleaned up. A sign advertising its sale was then placed in front of the tract. On April 25, 1966, an option contract to sell the five acres was executed by petitioner and Anthony Diekemper. The sale was consummated on October 14, 1966, and resulted in a profit to petitioner of $106,722.70. If the sale had not been made, the corporation would not have had a profit in that taxable year. In order to construct a one-story commercial building, the purchaser was later required to perform extensive cutting of timber, filling, grading, and compacting the soil. On its Federal corporate income tax return for the taxable year ended March 31, 1967, the petitioner deducted $113,854.15 as compensation for its three officers. Respondent determined that the compensation was excessive in the amount of $53,377.02 and disallowed the claimed compensation deduction for Paul H. Kummer and Edgar H. Kummer to the extent that it exceeded the amount of $24,000 for each of them. *289 ULTIMATE FINDINGS OF FACT 1. Amounts paid to Paul H. Kummer and Edgar H. Kummer in excess of $24,000 each during the corporation's taxable year ended March 31, 1967, constituted unreasonable compensation for past and current services rendered by them to the corporation. 2. Amounts paid to Paul H. Kummer and Edgar H. Kummer in excess of $24,000 each during the taxable year ended March 31, 1967, were in essence distributions of corporate earnings as dividends to the Kummers. OPINION Petitioner and respondent disagree on whether the amounts paid to Paul H. Kummer and Edgar H. Kummer, during the year in issue constituted "reasonable [allowances] for salaries or other compensation for personal services actually rendered" within the meaning of section 162(a) (1). [2]Petitioner has the burden of showing that the amounts disallowed by respondent were in fact reasonable compensation and, thus, ordinary and necessary expenses. Botany Worsted Mills v. United States, 278 U.S. 282 (1929). The issue is factual. *290 "Reasonableness" is a relative standard which may be used to measure an absolute such as an amount of compensation only after consideration of all the surrounding facts which place the absolute in perspective. As a result, several criteria have evolved as guides in determining for purposes of section 162 the reasonableness of compensation in particular cases. See Mayson Mfg. Co. v. Commissioner, 178 F.2d 115 (C.A. 6, 1949); 4A Mertens, Law of Federal Income Taxation sec. 25.69 et seq. Although we refer specifically only to those factors upon which we place the greatest reliance, we have considered all relevant criteria in reaching our conclusions. Petitioner contends that the Kummers were undercompensated in the earlier years when their subdivision was being developed and that the $50,688.51 received by each of the sons in the taxable year before us represents reasonable compensation for current and past services rendered to the corporation. Respondent, on the other hand, argues that the compensation paid to the Kummer sons in excess of $24,000 for each of them was unreasonable in amount and was a disguised distribution of corporate earnings rather than payment *291 for services rendered. Petitioner apparently does not dispute that the compensation paid to the Kummers was unreasonable for current services performed by them in the taxable year ended March 31, 1967. A deduction for reasonable services is not limited, however, to amounts paid as compensation for services performed in current years. Under the authority of Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930), employers may deduct as reasonable compensation payments made to employees for services performed in past years. But the petitioner has the burden of establishing this. See Dahlem Foundation, Inc., 54 T.C. 1566, 1579 (1970). The petitioner must also show that the payments were compensation for services actually rendered rather than distributions of earnings. Even though amounts paid as purported compensation may be reasonable, they may still be nondeductible because they are in substance camouflaged dividends. Klamath Medical Service Bureau, 29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (C.A. 9, 1958), certiorari denied 359 U.S. 966 (1959). *292 After careful examination of the entire record herein, we conclude that the petitioner has failed to satisfy its burden of proving that the compensation paid to the Kummer sons and deducted by the corporation in fiscal year 1967 was reasonable in amount and was paid for services which had been actually rendered to the corporation in current and past years. It is apparent to us that the petitioner was more concerned with absorbing profits expected in that taxable year than rewarding the efforts of its officers. Prior to the date of the May 1966 meeting of the board of directors, the Kummers anticipated that the corporation would realize a substantial profit on the sale of the commercial tract located upon its Ridgeline acreage because of the option contract which had been executed between petitioner and Diekemper the previous month. At the meeting, the long-standing bonus arrangement whereby 20 percent of net profits was paid to each of the three Kummers equally as additional compensation was altered so that the Kummer sons would thereafter receive 33-1/3 percent each of the net profits and Paul E. Kummer would receive only 8-1/3 percent. The effect of the resolution was to increase *293 the Kummers' share of the net profits from 60 percent to 75 percent. While the petitioner argues that the compensation in that fiscal year included payments for past services rendered by the Kummer sons, the testimony elicited at the trial does not convince us that any of the compensation received was paid by the corporation with the intention of compensating the Kummers for past services performed. Standard Asbestos Mfg. & Insulating Co., Inc. v. Commissioner, 276 F.2d 289 (C.A. 8, 1960), affirming a Memorandum Opinion of this Court; Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court. When asked on direct examination about the factors taken into consideration in establishing the overall compensation of the officers at the various meetings of the board of directors, Edgar Kummer testified that the compensation was merely dependent upon "what was coming up the next year and who was doing what work and what they would be entitled to in coming years or in the years to come" and that the basic salary was adjusted as the duties of the men changed. With respect to prior years, Edgar stated *294 that compensation was always low so that the corporation could maintain a profitable stance and thus avoid difficulties in securing bank loans. We think it apparent that the corporation's sudden increase in the amount of the officers' share of net income over the preceding year was designed to assure that profits expected from the sale of the commercial tract in the near future would be absorbed into deductible salaries. We do not have here the automatic operation of a long-standing bonus arrangement which provides materially higher compensation in a given year because of favorable business conditions. See Mayson Mfg. Co., supra at 120-121, but also Pepsi-Cola Bottling Company of Salina, Inc., 61 T.C. (January 29, 1974). Edgar did not state that the bonus increase approved at the May 1966 meeting was to compensate the officers for their past services, nor do the minutes of that meeting indicate that such was the intent of the corporation. Except for his rather vague assertion that "[any] bonus, as I see it, would be for any work that we did at any time whenever the income would accrue," there is every indication that the purpose of the bonuses was to distribute *295 the profits of the corporation to the shareholder-officers rather than to compensate them for past services. This is reflected in the following exchange between respondent's counsel and Edgar: Q. You stated on direct, did you not, that you felt that the compensation for the bonuses paid to you and Paul in the year 1967, your fiscal year 1967, were for compensation earned but not received in prior years? A. No. I said that we felt that we should have a bonus arrangement and we were entitled to one-third of whatever profit there might be on the bonus arrangement. Petitioner's expert witness testified that the average compensation of the Kummer sons over the years between 1948 and 1972 should have been $4,000 or $5,000 on the average above their average compensation of $17,300 for these years. His opinion was based upon his knowledge of the compensation paid to field superintendents or general superintendents in the construction business, derived from his experience with six of his clients for whom he performed services as a certified public accountant. We are unable to accept his conjecture as to what the reasonable salaries of the Kummers should have been over the years, *296 and we are not required to do so. Dayton Power & Light Co. v. Public Utilities Commissioner of Ohio, 292 U.S. 290, 299 (1934); Pacific Grains, Inc., supra at 606. Since neither Edgar nor Paul H. Kummer spent more than 60 percent of their time on subdivision work, a comparison of their work with that of a general superintendent is not accurate. Moreover, the expert's client corporations were involved in the construction and sale or rental of apartments, condominiums, single-family residences, and commercial facilities in projects which averaged between $10 million and $15 million in development costs as opposed to petitioner's much smaller-scale development in which only six homes were constructed in order to assist in the sale of the vacant lots. The expert's client corporations were not comparable to petitioner in other important respects. Four of the five corporations were electing subchapter S corporations, which are not subject to the corporate income tax themselves. Shareholders are taxable on all the income of a subchapter S corporation regardless of the salaries. The reasonableness of salaries, in light of dividends, is not involved. The remaining *297 nonelecting corporation referred to by the expert had an investment in excess of $15 million in its real estate activities. Besides the crucial differences in size between the purported comparables and petitioner, none of his client corporations was engaged in as closely an identical business as petitioner, which sold insurance and prepared tax returns in addition to conducting its real estate activities. Charles McCandless Tile Service v. United States, 422 F.2d 1336, 1339 (Ct. Cl. 1970). The witness testified that he had never been associated with any company which was exactly comparable to petitioner. The petitioner's assertion that over the entire 13 years of developing the subdivision the Kummers were underpaid does not appear to be compatible with the facts. In examining a schedule of officers' salaries paid by petitioner over these years together with the income tax returns reflecting the sales of the Ridgeline lots, it is clear to us that the Kummers were adequately compensated in the fiscal year ending in 1960, when the first section was completed and seven lots were sold, and in 1965, when 37 lots were sold and commissions were received upon the sale of *298 several large tracts of land, for any undercompensated services which they may have rendered in the immediately preceding years since the payments of $17,460.56 and $28,205.79 in those respective years were, in our estimation, excessive. Glasgow Village Development Corp., 36 T.C. 691, 700 (1961). All indications point to the fact that the payment of bonuses was based upon available funds throughout these years, but the effect of the overpayments in 1960 and 1965 for our purposes was compensation for the past services rendered prior to the completion and sale of the individual sections. We cannot fathom the petitioner's rationale in asking that we view the Kummers' sharing in the profits derived from the sale, in the taxable year ended in 1967, of the commercial tract upon which they exerted minimal personal efforts, as compensation for past services stretching back over the entire duration of the project. The relatively large amounts of taxable income of $10,671.48, $24,191.10 and $7,272.96 in 1960, 1965 and 1966, respectively, in comparison with other years, demonstrate that even greater compensation might have been paid to the Kummers in those years if the corporation *299 had deemed their past services as justifying such an action. The relative size of petitioner's taxable income in five of the preceding ten taxable years also disputes its assertion that the officers' salaries were kept low so that petitioner could obtain bank loans. Petitioner presented no testimony as to the amount of profits the banks demanded that petitioner earn in order to continue receiving loans. Edgar's testimony simply indicated that petitioner had only to avoid showing losses in two successive years in order to maintain its borrowing patterns. We acknowledge the realities of financial constraints placed upon real estate developers throughout the entire evolution of a project. Cash is not always available for adequate compensation until the final completion of a project. If we found that the Kummers were inadequately compensated in the past, then large compensation in 1967 would have been acceptable to us. Lucas v. Ox Fibre Brush Co., supra.However, absent the rendition of prior, undercompensated services, the sale of the commercial tract alone in the taxable year 1967 does not warrant the payment of the compensation received by the Kummers. The increase *300 in the value of the commercial tract resulted from the passage of time and the development of the surrounding area. Petitioner's realization of profit upon its sale arose primarily from its investment in the land rather than from the meager amount of actual services rendered by the Kummer sons in furtherance of its sale. See Dielectric Materials Co., 57 T.C. 587, 591 (1972). The facts in R. J. Nicoll Co., 59 T.C. 37 (1972) are distinguishable. The shareholder-employee in that case commenced business with his brother as a distributor for national oil companies and later entered the business of constructing and selling service stations through a successor corporation. During the early periods of the expansion and development of the business, he and his brother chose to leave as much money as possible in the corporation in order to provide funds for corporate operations and future investments and they expected to be compensated in later years for their services. They did not set their salaries on the basis of the reasonable value of the services rendered, their efforts, or the success of their enterprise. Consequently, we found that their annual salaries *301 were approximately $6,000 below the value of their services for prior years so that the compensation paid in the taxable years before the Court represented reasonable compensation for past services. There is no evidence in the instant case that the Kummers over the years limited their salaries for the benefit of the corporation with the expectation of recovering lost compensation in later years. There was no testimony from the shareholder-employees to this effect and no corporate resolutions indicating such intent were introduced.Throughout the 11-year period from 1957 through 1967, inclusively, the compensation paid to the three officers comprised, on the average, nearly 60 percent of the gross income of the corporation. It is plain that the Kummers caused the corporation to pay them as much in salaries as could be justified as reasonable. And, as previously noted, the salaries received by them in 1960 and 1965 adequately compensated them if they were not adequately compensated in preceding years. The circumstances here are much closer to Ben Perlmutter, 44 T.C. 382, 401-403 (1965), affd. 373 F.2d 45 (C.A. 10, 1967). There are other factors which *302 support the respondent's position and are indicative of a distribution of shareholder earnings cloaked in the disguise of salaries. Petitioner has never paid any dividends to its shareholders when profits in some years would have justified an investment return. Charles McCandless Tile Service, supra at 1340; Ben Perlmutter, supra at 402. The compensation paid to each of the three officer-shareholders in the fiscal year 1967 was almost exactly proportionate to their shareholdings, a factor which we find to be more than coincidental. Doernbecher Mfg. Co. v. Commissioner, 95 F.2d 296, 297 (C.A. 9, 1938), affirming 30 B.T.A. 973 (1934). And it is evident from the record that the elder Kummer's time and efforts on behalf of the corporation were diminishing in early 1960 even though he continued to earn the same compensation as his sons through 1966, so that it cannot be fairly said that his sudden loss of equal compensation in 1967 was attributable to any factor besides his reduction of stock ownership.
No bonuses were paid to anyone other than the officers-shareholders although the petitioner did employ some office personnel and *303 salesmen who contributed to the success of the business. In addition, the total compensation received by the officers in 1967 was almost twice the amount received by them in the previous years with no noticeable increase in the services performed, and it was 64 percent of petitioner's gross income and 82 percent of petitioner's net income before the deduction of officers' compensation and Federal income taxes. [3]Mayson Mfg. Co. v. Commissioner, 178 F.2d at 119. The compensation of the Kummer sons greatly exceeded the average compensation of $14,802.20 paid to them over the 13-year period from 1954 through 1966. [4]
Bearing in mind that any payment arrangement between a closely-held corporation and its stockholders is subject to close scrutiny, Heil Beauty Supplies, Inc. v. Commissioner, 199 F.2d 193, 194 *304 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court, we have concluded, and found as ultimate facts, that the amounts paid by the corporation to Paul H. and Edgar Kummer during the taxable year ended March 31, 1967, in excess of $24,000 to each, constituted both unreasonable compensation for services actually performed currently and in the past and was, in effect, the distribution of corporate earnings as dividends. Under these circumstances, we sustain the respondent's determination. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) IN GENERAL. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * ↩
3. See, e.g., The Barton-Gillet Co., T.C. Memo. 1970-157↩. 4. It was also greatly in excess of the average compensation paid them over the 15-year period from 1954 through 1968 of $17,487.65 and the average of $23,393.14 paid them over the two years before and after the taxable year 1967. ↩