**Ned MILLER and Frances Miller,**
**Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 69 C 715.**

United States District Court,
E. D. New York.

Nov. 25, 1975.

Leonard Feldman, New York City, for plaintiffs.

Robert A. Morse, U. S. Atty., for the Eastern District of New York by Robert M. Adler, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

---

## MEMORANDUM and ORDER

COSTANTINO, District Judge.

This is an action by a husband and wife for the recovery of federal income taxes and interest in the amount of $37,-923.75 paid with respect to plaintiffs' 1957 calendar year tax liability. This case was tried without a jury on April 5, 1973. The following constitutes this court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R. Civ.P.

### Findings of Fact

In the years 1955–1957, plaintiff taxpayer Ned Miller owned all the stock of two companies, 1680 Coney Island Avenue Realty Corporation ("Realty") and Miller Stormguard Corporation ("Stormguard"). Mr. Miller was president and chief executive officer of both corporations. He and his wife, plaintiff Frances Miller, were the only directors of Realty in the year 1957.

In the year 1955, Mr. Miller wanted to invest in a partnership called Pittsburgh Properties. To obtain money for investment in the partnership, he had a check for $65,000 issued by Stormguard to him personally. Mr. Miller in turn executed a promissory note in the sum of $65,000 payable on demand to the order of Stormguard Corporation. The rate of interest on the promissory note was fixed at 2½% percent.

Mr. David Rausch, who through the period in question was in charge of financial matters at Stormguard and Realty, told Mr. Miller in 1957 that Mr. Miller's loan from Stormguard would have to be replaced by a loan to Mr. Miller from Realty (Trial Tr. 51). This loan replacement was effected by issuing a check dated December 16, 1957 for $65,000 on Realty's checking account payable to Mr. Miller. Mr. Miller endorsed this check on the back and gave it to Rausch. Mr. Miller intended that the Realty check would discharge his obligation to Stormguard (Trial Tr. 33).

Toward the end of 1962, an independent audit of the affairs of Stormguard and Realty was conducted by Mr. Milton Seitman, a certified public accountant. Seitman discovered that although Realty had maintained books and records early in its existence, by 1955–1957 it no longer maintained books and records. Seitman was not able to determine the exact amount of Realty's earnings, though he determined that it had some earnings (Trial Tr. 58).

Seitman learned that the 1957 check drawn on Realty's account and endorsed

by Mr. Miller was deposited in Stormguard's cash receipts and credited to an account called "exchanges." Although the 1957 Realty check was intended by Miller to discharge his outstanding indebtedness to Stormguard, Rausch failed to give Mr. Miller credit for the Realty check on Stormguard's books; specifically, after the Realty check was transferred to Stormguard, Stormguard's loan account continued to show that Mr. Miller had an outstanding indebtedness of $65,000. After receiving the Realty check, Rausch issued a check drawn on Stormguard's checking account for $65,000 payable to Mr. Miller but never signed by the latter. This check was entered in Stormguard's cash disbursements book and was found in Rausch's drawer by Seitman (Trial Tr. 66–67).

The record indicates that Mr. Miller did not intend to repay the $65,000 which Realty paid to him. Several factors support this conclusion. First, the original promissory note executed in 1955, whose terms were continued in the obligation to Realty in 1957, did not provide a repayment schedule. The note simply stated that repayment was to be made "on demand." In view of the fact that Mr. Miller had control of Stormguard in 1955 and Realty in 1957, as a practical matter Mr. Miller could choose not to repay the note at all. Second, Seitman's audit revealed that Mr. Miller never made any repayments on the principal to either Stormguard or Realty (Trial Tr. 75–76). Third, there is no indication in the record that Realty has ever sought to collect payments on the principal. Fourth, Mr. Miller advised Seitman that he would repay the principal if the Pittsburgh investment was ever dissolved (Trial Tr. 78). Mr. Miller also told Seitman, however, that he hoped the Pittsburgh Properties investment would be "forever" (Trial Tr. 79–80). Indeed, when the Pittsburgh Properties investment had to be liquidated approximately five years prior to trial, Mr. Miller's best recollection is that he kept for his personal account the several hundred dollars he received as his share of the liquidated property (Trial Tr. 47). Contrary to his earlier statement, after the Pittsburgh Properties investment was liquidated he did not make any repayment on the principal of his outstanding indebtedness. Fifth, the evidence supporting Mr. Miller's contention that he intended in 1957 to repay the $65,000 indebtedness is extremely weak. It consists essentially of Mr. Miller's self-serving statements at trial, continuation in 1957 of the terms of the non-binding promissory note executed in 1955, and the making of interest payments on the loan (for which he took deductions on his tax returns, Trial Tr. 71). On the basis of the foregoing, this court concludes that at the time Realty made the $65,000 payment in 1957, Mr. Miller did not intend to repay the principal sum.

### Conclusions of Law

The legal issue in this case is whether the payment by Realty of $65,000 to Mr. Miller in 1957 constitutes a dividend to the taxpayers as defined in 26 U.S.C. § 316. The latter statute defines dividend as any distribution of property by a corporation to its shareholders out of its earnings and profits accumulated after February 28, 1913 or out of the earnings and profits of the current taxable year. Under the 1954 Internal Revenue Code, money and any other property except stock or stock rights in the distributing corporation are treated as property distributed by a corporation to the shareholder. 26 U.S.C. § 317(a).

 Although Realty did not label the $65,000 check made payable to Miller a dividend, the check may constitute a dividend nevertheless, see *Regensburg v. Commissioner of Internal Revenue,* 144 F.2d 41 (2d Cir. 1944), *cert. denied,* 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625 (1944). The crucial concept in a finding that there is a constructive dividend is that the corporation has conferred a benefit on the stockholder in order to distribute available earnings and profits without expectation of repayment. *Tol-*

*lefsen v. Commissioner of Internal Revenue*, 431 F.2d 511, 513 (2d Cir. 1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971); 1 Merten's Law of Federal Income Taxation § 9.07; *see Joseph Lupowitz Sons, Inc. v. Commissioner of Internal Revenue*, 497 F.2d 862 (3d Cir. 1974). In the case at bar, the first question is whether Realty conferred a benefit on Miller in issuing the $65,000 check dated December 16, 1957. Although Stormguard's books do not indicate that the Realty check repaid Mr. Miller's loan, these book entries are merely evidentiary rather than controlling. 1 Merten's Law of Federal Taxation § 9.06. It is a basic principle of tax law that the "form into which a taxpayer casts a transaction will not obliterate the tax consequences that emerge from the substance of the transaction." *Tollefsen v. Commissioner of Internal Revenue*, 431 F.2d at 512. Mr. Miller, the chief executive officer of both Realty and Stormguard, clearly intended to have the Realty check discharge his obligation to Stormguard (Trial Tr. 33). In view of this intention and the facts surrounding the transaction, the court must conclude that the distribution discharged Mr. Miller's obligation to Stormguard.

 The $65,000 diverted is taxable as income up to the amount of Realty's earnings and profits at the close of the taxable year in which the property was distributed. 26 U.S.C. § 316. The second question is, then, whether Realty had available earnings and profits in the sum of $65,000 at the close of the taxable year in which the distribution was made. The burden is "on the individual taxpayers to establish that the corporation did *not* have earnings and profits equal to the amounts diverted." *DiZenzo v. Commissioner of Internal Revenue*, 348 F.2d 122, 127 (2d Cir. 1965). Here, the plaintiffs have not shown that Realty had earnings and profits of less than $65,000 at the close of the taxable year in which the distribution was made.

The third question is whether repayment was in fact contemplated by the parties. For the reasons given above, the court concludes that repayment was not contemplated by the parties. Under the foregoing test, it is clear that the taxpayers received dividend income of $65,000 in 1957. The court holds that the taxpayers are not entitled to recover the federal income taxes and interest they seek.

So ordered.