**CALEDONIAN RECORD PUBLISHING CO., INC., Herbert G. Smith, Barbara Smith, Mark M. Smith and Karen Smith**

v.

**UNITED STATES of America.**

**Civ. No. 79–202.**

United States District Court, D. Vermont.

Oct. 13, 1983.

John L. Primmer, Primmer & Piper, St. Johnsbury, Vt., for plaintiffs.

Thomas R. Jones, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

HOLDEN, District Judge.

Plaintiff taxpayers brought this action in September, 1979, to obtain the refund of certain federal income tax payments assessed against them by the Internal Revenue Service (the "Service") and subsequently paid. After a bench trial, decision was withheld in accordance with the request of the parties to submit additional written argument. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(1). Taxpayers Herbert G. (H. Gordon) Smith, Barbara Smith and Mark Smith were the individual shareholders and officers of the corporate taxpayer during the years for which taxes are at issue, 1971 through 1976. H. Gordon and Barbara Smith are husband and wife, and filed joint federal income tax returns during this period. Taxpayers Mark M. and Karen Smith are also husband and wife, and the son and daughter-in-law of H. Gordon and Barbara Smith. Karen Smith is a plaintiff in this action solely by virtue of filing joint federal

income tax returns with Mark Smith during the period at issue.

The taxpayers contend, specifically, that the Caledonian Record Publishing Company, Inc. (the "Caledonian") was entitled to deductions disallowed by the Service for: (1) post-graduate tuition payments made from 1971 through 1974 on behalf of Mark Smith to obtain Bachelor of Arts and Master of Arts degrees in journalism and a Master of Business Administration degree; (2) moving expenses paid on behalf of Mark Smith during that period; (3) certain compensation paid Mark Smith in the years 1971 through 1973 and in 1975 and 1976, and Barbara Smith in the years 1972 and 1973, determined by the Service to be unreasonable in amount; and (4) travel and entertainment expenses incurred for two trips to Montreal in 1973 and 1974 by H. Gordon and Barbara Smith, Mr. and Mrs. Frederick Mold and Dr. and Mrs. Frederick Silloway. Taxpayers further contend that the tuition payments and moving expenses paid on behalf of Mark Smith should not have been included in his income by the Service, and that the travel and entertainment expenses disallowed as a corporate deduction should not have been included in the income of H. Gordon and Barbara Smith.[1]

## Findings of Fact

The Caledonian Record is a daily newspaper, published in St. Johnsbury, Vermont by the corporate taxpayer. The paper had a circulation of between 8,000 and 9,000 for the years 1971–1976, and employed approximately 40 people during that time. The Caledonian Record has been owned by the Smith family for approximately sixty years. Herbert A. Smith, H. Gordon Smith's father, was the publisher from 1920 until 1949, when H. Gordon Smith assumed his role. The Caledonian is a closely held, family corporation. During the years 1971 through 1976, 175 of the corporation's 200 total shares were held by the Smith Family

Trust, of which H. Gordon Smith is the trustee. Barbara Smith held four shares. In 1971, H. Gordon Smith held the remaining 21 shares, and Mark Smith held no stock. In 1972, 1973 and 1974, H. Gordon Smith transferred six shares per year to Mark Smith, and in 1975 he transferred his remaining three shares. At that time, he was eliminated as a shareholder of record and Mark Smith owned 21 shares. During all the years at issue, H. Gordon Smith was the corporation's President, Mark Smith was the Vice-president, and Barbara Smith was the Treasurer. Michael Smith, Mark's older brother, was also an officer and director of the corporation. As such he received director's fees but was not otherwise employed by the company and received no other compensation.

Mark Smith began to work for the company as a newsboy in 1956, and continued to work for the Caledonian during his vacations from high school and college, in 1962 through 1970. He graduated from St. Lawrence University in June, 1970, with a Bachelor of Arts degree. On June 29, 1970, he executed a contract with the Caledonian through its president H. Gordon Smith, in which the Caledonian agreed that it would pay Mark Smith's tuition at the University of Missouri for two years while he studied journalism. The contract contained a stipulation that the agreement could be extended to cover further schooling at the corporation's option. The agreement provided that Mark Smith would receive a salary of $200.00 per week for at least two years while undertaking such schooling. Mark Smith, on his part, agreed to take the best courses available in the field of journalism with emphasis on problems relevant to the operation of the Caledonian Record, and to report regularly to his father on what he was learning. The agreement provided that if Mark Smith failed to return to the Caledonian as a full-time employee upon completion of his schooling he would reimburse the Caledoni-

---

1. Total refunds claimed are as follows:

| | |
|---|---|
| Caledonian Record: | $32,952 |
| Mark and Karen Smith: | 4,786 |
| H. Gordon and Barbara Smith: | 2,081 |
| TOTAL: | $39,719 |

an $2500 for each year of schooling provided. His indebtedness was to be reduced at the rate of $1,000 for each year of employment completed with the paper.

Mark Smith attended the University of Missouri from September, 1970 through June, 1972, taking journalism courses, and earning a second Bachelor of Arts degree in that field. During that time, he was paid $200.00 per week by the Caledonian, during the academic years and the summer recesses which he spent working at the Caledonian. Upon completion of that course of study, the agreement with the Caledonian was extended while he attended Syracuse University from September, 1972 through June, 1974 and earned a Master of Arts degree in journalism and a Masters degree in Business Administration. During that period Mark received $250.00 per week. In June, 1974, he joined the Caledonian Record in the full-time position of Assistant Publisher. The Caledonian made tuition payments on Mark Smith's behalf of $1500 in 1970–71, $2210 in 1971–72, $4289 in 1972–73, and $2075 in 1973–74. It paid moving expenses for Mark and Karen Smith of $803 in 1972 and $737 in 1974. It deducted these expenditures as business expenses. These deductions were disallowed by the Service.

Mark Smith's total compensation from the Caledonian for the years 1971, 1972, and 1973 was $11,150, $12,425 and $13,100, respectively. The Service allowed $3,000 as reasonable compensation for services in each year. Mark and Karen Smith paid

federal income taxes on the full amount of this compensation for the years 1971–73.

The agreement between the Caledonian and Mark Smith would not have been made with anyone other than the publisher's son. H. Gordon Smith offered his elder son, Michael, the same opportunity to eventually assume control of the paper, but Michael Smith chose to pursue a career in the law. Had Mark also failed to express interest in the paper, H. Gordon Smith would have sold the Caledonian Record. H. Gordon Smith understandably wished to keep the ownership of the paper in the family and intended that one of his sons succeed him as publisher. The long-term employees of the paper understood from the time that Mark Smith was a college undergraduate that he would succeed his father as publisher of the Caledonian Record. Other members of the paper's staff have in the past been sent at the expense of the corporation to attend courses or seminars in the field of journalism, but no other person has received extensive, regular, or full-time education at the paper's expense.

Barbara Smith has worked part-time in various capacities for the paper since 1956. In the early 1970's her duties expanded and she began to edit the copy from all the surrounding towns that reported to the Caledonian Record. In 1972 and 1973, she worked between 25 and 30 hours per week for the paper, in the position of copy editor. Her responsibilities increased between 1971 and 1972. Compensation for the eight "key employees" of the paper for the years 1971–1976 is set out in the margin.[2]

(Stipulation of parties, paper 22)

**2.** (Stipulation of parties, paper 22)

Salaries of Caledonian Record Employees

| | 1971 | | 1972 | | 1973 | |
|---|---|---|---|---|---|---|
| | Basic salary | bonus | Basic salary | bonus | Basic salary | bonus |
| Publisher * | $65,000 | $0 | $65,000 | $0 | $65,000 | $0 |
| Assistant Publisher ** | ---- | | ---- | | ---- | |
| Circulation Manager | 10,939 | 1,260 | 11,782 | 3,250 | 13,166 | 2,000 |
| Advertising Manager | 12,760 | 5,160 | 14,920 | 3,250 | 15,700 | 2,000 |
| Managing Ed. | 10,740 | 1,260 | 11,270 | 3,250 | 11,790 | 2,000 |
| Copy Editor *** | 6,350 | 0 | 7,900 | 3,250 | 7,900 | 2,000 |
| Mechanical Supervisor | 10,960 | 1,260 | 11,480 | 3,250 | 12,000 | 2,000 |

Dr. and Mrs. Frederick Silloway and Mr. and Mrs. Frederick Mold were personal friends of the H. Gordon Smiths. The Smiths had taken other trips with each of the two couples, in addition to the two trips to Montreal paid for by the Caledonian. Mr. Mold and Dr. Silloway had both contributed columns concerning their avocations of weather reporting and sailing. Neither was an employee of the paper, and both had refused compensation for their journalistic contributions. No business relating to the Caledonian Record was conducted by the Smiths, Molds and Silloways on the 1973 and 1974 Montreal trips at issue here.

The Caledonian Record Publishing Company has never paid any dividends to its shareholders, despite substantial accumulations of earnings and profits.

### Discussion

#### Tuition and Moving Expenses

■ In order to be currently deductible by a corporation, expenditures must be "ordinary and necessary" business expenses. 26 U.S.C. § 162(a). The court holds that the tuition payments, and the moving expenses incidental to the pursuit of Mark Smith's education, were not "ordinary and necessary" business expenditures by the Caledonian, and were not properly deductible by the corporation. H. Gordon Smith testified that he believed it was necessary for the good of the paper that its future leadership be educated in the field, particularly in the area of changing technology in the newspaper industry. The court finds no reason to doubt that Mark Smith's education has been of benefit to the paper. The term "necessary" has been used to include "appropriate" and "helpful." *Welch v. Helvering*, 290 U.S. 111, 113, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933) (Cardozo, J.). Necessity is, however, but half the test. Expenditures must be "ordinary," as well as beneficial, in order to be deductible.

Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not

### Salaries of Caledonian Record Employees

| | 1971 | | 1972 | | 1973 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Basic salary | bonus | Basic salary | bonus | Basic salary | bonus |
| Business Dept. Manager | 7,957 | 1,260 | 8,329 | 3,250 | 8,329 | 2,000 |

| | 1974 | | 1975 | | 1976 | |
| --- | --- | --- | --- | --- | --- | --- |
| Publisher | $65,000 | $0 | $65,000 | $0 | $60,950 | $4,600 |
| Assistant Publisher | 23,600 | 0 | 36,400 | 800 | 42,400 | 4,500 |
| Circulation Manager | 14,330 | 2,100 | 14,380 | 100 | 16,270 | 1,200 |
| Advertising Manager | 16,400 | 2,100 | 18,580 | 100 | 20,405 | 1,540 |
| Managing Editor | 12,060 | 2,100 | 12,200 | 3,540 | 13,250 | 1,000 |
| Copy Editor | 7,900 | 2,100 | 7,900 | 100 | 7,950 | 450 |
| Mechanical Supervisor | 12,520 | 2,100 | 12,780 | 100 | 14,045 | 1,060 |
| Business Dept. Manager | 8,893 | 2,100 | 9,060 | 100 | 9,805 | 740 |

\* H. Gordon Smith     \*\* Mark M. Smith     \*\*\* Barbara Smith

mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often.... The situation [may be] unique in the life of the individual affected but not in the life of the group, the community, of which he is a part.

*Id.* at 114, 54 S.Ct. at 9.[3]

Ordinary has the connotation of normal, usual, or customary. To be sure, an expense may be ordinary though it happens but once in the taxpayer's lifetime. Yet the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved.

*Deputy v. DuPont,* 308 U.S. 488, 495, 60 S.Ct. 363, 367, 84 L.Ed. 416 (1940) (citations omitted).

The taxpayers have not carried their burden of producing evidence to support their claim that the financing of four years of post-graduate education is an expenditure normally, or ever, undertaken by any newspaper publishing organization. Evidence that the nation's largest news organizations undertake such programs would not necessarily be persuasive of the ordinary nature of such expenses for small rural papers; but even evidence of that type was not forthcoming. The taxpayers failed to show that comparable newspapers normally hire persons with Master of Arts degrees in journalism, let alone finance their educations. Evidence was produced that the Caledonian has in the past financed the attendance of certain of its employees at special one-time seminars in their fields. This is not the equivalent of the education afforded Mark Smith.

The testimony of H. Gordon Smith at trial made it clear that this opportunity would not have been offered to anyone other than a family member. In this context it was made to further the interests of the Smith family rather than the business enterprise they controlled. The court concludes that the expenditure was not "ordinary" within the meaning of the statute as read and construed by the Supreme Court in *Welch* and *DuPont* quoted earlier. H. Gordon Smith quite naturally wished his son to take over the management of the company after his own retirement, and wished to make that succession easier. But the fact that only H. Gordon Smith's son was offered this opportunity indicates that much of the benefit derived from the expenditure was of a personal nature. The fact that the Smith family trust controlled the affairs of the corporate enterprise cannot justify the transfer of the tax burden out of the family domain.

A parallel instance is found in *Lewis v. Commissioner,* 8 T.C. 770 (1947), *aff'd. per curiam,* 164 F.2d 885 (2d Cir.1947). In that case, the father, an attorney, executed a very similar contract with his son, providing that his tuition and living expenses at the University of Virginia Law School would be paid by the father. The father then attempted to deduct the costs incurred under the contract as business expenses incident to the provision of a new associate. Plaintiffs assert that this case is inapposite, since it was decided before any deductions were allowed in the tax code for educational expenses in general. The Tax Court in that case based its reasoning primarily, however, upon the proposition that this particular contract was not an ordinary expense of the business, because the taxpayer acknowledged that it was "unique" and could cite no other examples of such an arrangement in his profession. Further, the amount paid the son for living expenses

---

**3.** Although exceptions to the principle of the non-deductible nature of educational expenditures have been carved out by regulation since Justice Cardozo delivered the opinion in *Welch,* his characterization in that case of the costs of an education is aptly applied to the expenditures in the instant case, failing as they do to meet the tests of the relevant regulations:

Reputation and learning are akin to capital assets, like the good will of an old partnership. For many, they are the only tools with which to hew a pathway to success. The money spent in acquiring them is well and wisely spent. It is not an ordinary expense of the operation of a business.

*Welch v. Helvering,* 290 U.S. 111, 115–16, 54 S.Ct. 8, 9–10, 78 L.Ed. 212 (1933) (citations omitted).

while he was attending law school was shown to be related to the cost of living for himself and his wife, and was not proportionate to any services performed for the business. The fact that a legal obligation to pay existed by virtue of the contract was held not to be dispositive of the deductibility of the payments. Deductibility is dependent upon the nature of the transaction in which the obligation was incurred. The court held that the payments were made in furtherance of the satisfaction of a personal desire of the father and son that the son should succeed the father in his business.

Taxpayers argue that the tuition payments made by the Caledonian would have been deductible by Mark Smith if he had paid them himself. The deductibility of educational expenditures made by individual taxpayers on their own behalfs is governed by 26 C.F.R. § 1.162–5. The Service has taken the position that an educational expenditure made by an employer directly to an educational institution on behalf of an employee which is deductible to the employer as an ordinary and necessary business expense will not be taxable to the employee. Further, where an employer reimburses employees for tuition expenditures for educational courses beneficial to the conduct of the employer's business, such reimbursements need not be reported by the employees as income, pursuant to 26 C.F.R. § 1.162–17(b)(1), which governs the reimbursement of ordinary and necessary business expenditures made by employees. Rev.Rul. 76–71 at 310. *Cf. Bingler v. Johnson*, 394 U.S. 741, 744 n. 9, 89 S.Ct. 1439, 1441 n. 9, 22 L.Ed.2d 695 (1968) (tuition fees paid by employer conceptually includible in income but presumably offset by educational expense deductions). The Service has also stated that an employee's educational expenses that satisfy the deductibility requirements of 26 C.F.R. § 1.162–5 are considered by the Service as expenses incurred in pursuing the employer's trade or business. Rev.Rul. 76–71 at 309. The concepts of ordinary and necessary business expenditures and of deductible education expenditures are opposite sides of a single coin. In the instant case,

the court holds that Mark Smith has failed to meet the requirements of § 1.162–5 which would have been imposed had he made the tuition payments himself.

The applicable regulations provide that in order to be deductible expenditures must (1) maintain or improve skills required by the individual in his employment or other trade or business, or (2) meet the express requirements of the individual's employer, or the requirements of applicable law or regulations, imposed as a condition of the retention by the individual of an established employment relationship, status, or rate of compensation. Even if expenditures meet these requirements, they will not be deductible if (1) the expenditures are necessary to meet the minimum educational requirements for qualification in the employment or other trade or business, or (2) qualify the individual in a new trade or business.

■ The parties agree that there are no minimum requirements imposed by law, regulation, or the trade itself for employment in the newspaper business. The taxpayers have failed to prove that Mark Smith was actually established in the newspaper business before undertaking this course of study, or that the course of study was required as a condition of the retention of an established employment relationship with the paper. The requirement that one be actively established or employed in a trade or business in order to deduct educational expenditures is clear. At all times before undertaking his full-time study at the University of Missouri, Mark Smith had worked for the paper in the capacity of a high school or college student on vacation. Taxpayers have pointed the court to no other cases in which such vacation work in the employ of the taxpayer's father established the fact that an individual was actively employed or engaged in a trade or business. Deductible expenditure must relate to the present, not the future, occupation of the taxpayer. *Canter v. United States*, 354 F.2d 352, n. 4 (Ct.Cl.1965).

The taxpayers attempt to rely upon the contract between Mark Smith and the Caledonian to prove the existence of an established employment relationship. It is true that proof that a taxpayer is merely on a leave of absence from his established employment for the purpose of undertaking further education is of considerable importance in determining the deductibility of educational expenditures. In *Canter v. United States, supra,* 354 F.2d 352, the taxpayer was employed as a nurse with the United States Public Health Service until August 26, 1958. She had been on a leave of absence since February of 1958, in order to become a full-time student in a nursing program. She had no understanding regarding a return to the employment of the Service, although she did so return some nine months after obtaining her master's degree. The court, in disallowing a deduction for her educational expenses, held that the mere continuation of the taxpayer's professional status as a nurse during the years in which she was studying for a master's degree was not a sufficient basis on which to find that she was "carrying on a business." [4] The court relied heavily upon the fact that there was no agreement under which the taxpayer would return to her former employment.

The Service, in Rev.Rul. 60–97, stated the premise implicit in *Canter,* that:

[I]f a taxpayer who has ceased to engage in employment or other business subsequently undertakes education or training preparatory to resuming engagement in such employment or other business, the cost of such education is not deductible. A taxpayer will not be considered to have ceased to engage in his employment or other business during an off-duty season, when he is on vacation, or when he is on *temporary leave of absence.*

Rev.Rul. 60–97 at 70 (emphasis added).

The importance of a continuing contractual relationship was emphasized by the Tax Court in *Peggy A. King,* 21 T.C.M.

(CCH) 495 (1962), in which the taxpayer was a teacher in the Fort Worth, Texas, public school system. She left to become a full-time graduate student at Stanford University, but during the year for which a deduction was claimed she was either under a contract with the school system or on an official leave of absence. The court found this fact dispositive in allowing the deduction. The taxpayers attempt to liken Mark Smith's contractual obligation to undertake full time work with the Caledonian to such an official leave of absence. But the court finds in the instant case that no existing, as opposed to future, employment relationship has been convincingly established.

■ The contract at issue here was not drafted at arms length, executed as it was between the corporation's controlling shareholder and his son. For this reason it also fails to satisfy the second alternative criterion for deductibility, that Mark Smith undertook his education as a requirement of his employment with the paper. It is clear from the testimony at trial that it had been known for years that Mark Smith was to succeed H. Gordon Smith. The taxpayers have not produced credible evidence that, had Mark Smith failed to complete or undertake the course of study in journalism, he would have been excluded from the paper's employ. Further, expenditures are only deductible if required as a condition of the retention of an established employment relationship, status, or salary. Expenses for education which prepares an employee for a significant promotion and/or salary increase, even if he remains in the service of the same employer, will not be deductible. *See, e.g., Sandt v. Commissioner,* 303 F.2d 111 (3d Cir.1962) (expenses for attendance at law school required for research chemist in employ of DuPont to advance to position of patent chemist at DuPont, with concomitant 67 to 90% salary increase not deductible). Taxpayers in the instant case

---

4. *Cf. Johnson v. Commissioner,* 332 F.Supp. 906 (E.D.La.1971) (admission to bar not enough to establish deductibility of expenses incurred in full time program of study for master's degree in taxation, where taxpayer had not actively engaged in practice of law between time of receiving J.D. degree and entering master's program).

rely upon Mark Smith's education in journalism as a principal rationale and justification for the award of his later title of Assistant Publisher and his accompanying relatively high salary, compared to the company's other employees.

■ Since Mark Smith's tuition payments were not deductible business expenses of the Caledonian, it must be determined whether they were properly includible by the Service in Mark Smith's taxable income. The Service argues that in the years 1972 through 1974 Mark Smith was a corporate stockholder, and that the payments were therefore dividend income to him. In 1971, Mark Smith held no stock. The Service takes the position that in that year the payments were "income from any other source derived" under 26 U.S.C. § 61(a). Taxpayers respond that, if not deductible business expense of the company, the payments should be denominated as gifts from the company to Mark Smith and should not be includible in his income. The court adopts the position of the taxpayers. The payments are not includible in Mark Smith's income.

The Service notes in its July 26, 1983 memorandum that these payments could properly have been included in H. Gordon Smith's income as a constructive dividend.

[A] taxpayer can be charged with disguised or constructive dividend income even though the corporation has not observed the formalities of dividend declaration, and has not made a pro rata distribution to the entire class of shareholders, and even though neither the corporation nor the shareholder intended a dividend and the corporation did not record the distribution as a dividend for bookkeeping purposes.

*Crosby v. United States*, 496 F.2d 1384, 1388 (5th Cir.1974); *see Honigman v. Commissioner*, 466 F.2d 69 (6th Cir.1972).

■ A constructive dividend may be found where property is not distributed directly to the shareholder, but the corporation confers an economic benefit on the shareholder. *Crosby v. United States*, *supra*, 496 F.2d 1388; *cf. Miller v. United States*, 404 F.Supp. 284, 286 (E.D.N.Y. 1975), *aff'd without opinion*, 538 F.2d 311 (2d Cir.1976).

As the controlling shareholder of the corporation, H. Gordon Smith derived a personal benefit from these payments; training of his son to succeed him in the field of journalism, and fulfilling the parental need to afford educational advantage to his son. *Cf. Montgomery Engineering Co. v. United States*, 344 F.2d 996 (3d Cir.1965) (conscience payment made by corporation at controlling shareholder's behest to widow of former associate, where no obligation to make payment existed on part of corporation, not a deductible expense of corporation and properly includible as dividend income to controlling shareholder). The Service did not, however, attempt to impose this treatment upon the payments and cannot now do so.

In cases in which a closely held corporation confers an economic benefit upon the children or other relatives of the controlling shareholder, the intent behind the payment must be examined to determine the proper treatment in the hands of the recipient. In *Anaheim Paper Mill Supplies, Inc. v. Commissioner*, 1978–86 T.C.M. (CCH) ¶ 35,015(M), a corporation paid the college tuition expenses on behalf of the son of the principal shareholder, when he returned to college after having become active in the father's business. The court held that these payments were not deductible by the corporation. It found, however, that the corporation stood in the stead of the father, and stated that it saw no reason why a "corporate father" should fare differently from a natural father regarding the treatment of college expenses. The payment was treated as it would have been had the father paid the expenses; it was non-deductible to the benefactor but excludable as a gift from the son's income. *Cf. Smith v. Manning*, 189 F.2d 345 (3d Cir.1951) (daughters of controlling shareholder paid salaries determined to be unreasonable and non-deductible by Service; daughters' burden of showing, in any subsequent proceeding to obtain refund, ex-

cess compensation was gift rather than compensation made easier by inference of donative intent on part of father). In this case, Mark Smith's ownership of stock in the years after 1971 was incidental to the tuition benefits bestowed upon him. The primary motivation for the tuition and allowance payments was H. Gordon Smith's paternal donative intent to educate his son to succeed him in the family enterprise.

*Compensation to Mark Smith*

■ Taxpayers are allowed a deduction, under 26 U.S.C. § 162(a), for reasonable salary expenses incurred in the operation of their businesses. The Treasury Department has promulgated regulations at 26 C.F.R. § 1.162–7 and 8 governing the deductibility of compensation for personal services. These regulations provide that compensation, to be deductible, must be "reasonable and in fact payments purely for services." The burden of proof rests upon the taxpayer to disprove the Commissioner's determination of unreasonableness, as it does in the case of every claimed deduction which is disallowed by the Service. *E.g. Welch v. Helvering, supra,* 290 U.S. at 115, 54 S.Ct. at 9. The pertinent facts and circumstances to be considered in a case in which the Service finds the level of compensation to be unreasonable were set forth in *Mayson Mfg. Co. v. Commissioner,* 178 F.2d 115, 119 (6th Cir.1949) as follows:

> [They include] the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years.... The situation must be considered as a whole with no single factor decisive.

■ The court holds that the taxpayers have not sustained their burden of demonstrating that all compensation paid to Mark Smith in the years 1971–1973 was reasonable. The disallowance of all but $3,000 salary per year as unreasonable is fully supported by the evidence. Mark Smith was away from the paper for the entire academic year during that period. His only responsibility, when not employed during his summer vacations, was to report to his father on what he was learning in his courses. And an objective of this requirement was stated in the contract to be for the purpose of assuring the corporation that he was attending to his duty, that is, was studying. During the years 1971 through 1973, despite his absence, Mark Smith was paid at a rate comparable to that of the Circulation and Advertising Managers, the Managing Editor, and the Mechanical Supervisor of the paper, persons with much more experience who worked at the paper in a full-time capacity. Perhaps most tellingly, when asked how Mark's salary for those years had been set, H. Gordon Smith responded that it was the amount that Mark needed to live on, since he was married at the time. This scarcely serves to link his compensation to the value of current services rendered.

■ The Service seeks to include the excess compensation paid in these years in Mark Smith's income, while disallowing the deduction to the corporation. Mark and Karen Smith paid taxes on this income as compensation in the years in which it was received. The Service characterizes the income in 1972 and 1973 as dividend distributions, and the income in 1971 generally as from any other source, as it did the tuition payments in those years. For the same reasons that the tuition payments must be denominated a gift from the corporation the court finds that the excess compensation must likewise be treated as a gift, and thus not included in Mark Smith's taxable

income. The excess payments were in fact living expense allowances incident to Mark Smith's education, and necessary to enable him to pursue that education. They were an inseparable part of H. Gordon Smith's overall plan to educate his son. There is no logically supportable distinction between the tuition payments made to finance Mark Smith's education and the living expenses paid to support him while he studied.

■ Nor have the taxpayers demonstrated that the salary paid Mark Smith in the years 1975 and 1976 was reasonable. An important factor in determining the reasonableness of compensation is a comparison to the amounts that ordinarily would be paid by similar enterprises under similar circumstances. *News Publishing Co. v. United States,* 81–1 U.S.T.C. ¶ 9435, *adopted per curiam,* 81–2 U.S.T.C. ¶ 9753 (Ct.Cl.1981). Taxpayers have adduced no evidence of salaries paid elsewhere in the industry, for persons in comparable positions. In fact, they produced no evidence that comparable positions at small, rural papers exist.[5]

Another significant factor is a comparison of the compensation in question with that of other non-shareholder employees. The amount paid to Mark Smith are far in excess of any other salary paid by the paper, with the exception of his father's. The evidence showed that H. Gordon Smith retained ultimate authority for all major decisions at the paper until his retirement in 1982. Further, he had thirty years of experience, while Mark had only a few months of experience in 1975. The taxpayers point out that Mark Smith's education exceeded that of any other employee, and that his responsibilities were also greater. Given that these facts are correct it is also true that Mark Smith had less experience than any of the other key employees who

were paid from less than one-half to one-fourth of his salary for the years in question. And, while he did apparently perform special projects which might not have been addressed in his absence, much of his time in the initial stages of his employment appears to have been spent learning the various phases of the business. The taxpayers have not shown convincingly that Mark Smith filled a vacancy at the paper when he began full-time employment that merited the large compensation he received in relation to the other employees at the newspaper.

■ When a case involves a closely held corporation where the controlling shareholder-executives set their own compensation, close scrutiny is necessitated to ascertain whether such alleged compensation is in fact a distribution of corporate profits. *Levenson and Klein, Inc. v. Commissioner,* 67 T.C. 694, 709 (1977); *Perlmutter v. Commissioner,* 373 F.2d 45, 47 (10th Cir.1967).

> An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock.

26 C.F.R. § 1.162–7(b)(1).

■ This regulation summarizes a collection of cases which over the years have determined that ostensible salaries paid to controlling shareholders of corporations

---

5. Robert W. Mitchell, publisher and senior editor of the Rutland Herald, a Vermont daily newspaper with a circulation of 21,000, testified that between 1971 and 1976 a new employee with a journalism degree would have been paid about $175 to $200 per week by his paper. He was unaware of any instances in which a newspaper had paid the tuition of an employee to obtain a master's degree. Transcript p. 155–56.

are in reality disguised dividend payments. The advantage of such excessive salary payments is clear; compensation or wages represent a deductible expense to the corporation while dividend payments do not. The fact that a closely-held corporation does not make regular distributions of profits is an additional warning that excessive compensation to a shareholder/employee may in fact be a disguised dividend. *Mayson Mfg. Co. v. Commissioner, supra,* 178 F.2d at 119; Rev.Rul. 79–8.

> The failure of a closely held corporation to pay more than an insubstantial portion of its earnings as dividends on its stock is a very significant factor to be taken into account in determining the deductibility of compensation paid by the corporation to its shareholder/employees.

Rev.Rul 79–8; *see Mayson Mfg. Co. v. Commissioner, supra,* 178 F.2d at 119.[6]

■ The excess compensation paid to Mark Smith in 1975 and 1976 should have been treated as a dividend distribution, and included in his income. The situation in those years differed considerably from that in 1971–1973. Mark Smith owned more stock, and was more actively involved in the affairs of the corporation. The payments did reflect a withdrawal of corporate profits by an active shareholder/employee. As a member of the controlling group of shareholders, Mark Smith was certainly entitled to the payments he obtained in 1975 and 1976; he was not, however, entitled to obtain dividends in the guise of salary in a manner which made their payment tax-free to the corporation.

The Service disallowed a deduction for all compensation in excess of $28,400 in 1975 and $34,000 in 1976. The court holds that the determination of reasonable compensation for 1976 must be upheld. In its 1975

figure, the Service is, however, inconsistent. The parties stipulated that Mark Smith was paid $250.00 per week during the first half of 1974, while he attended Syracuse University, and $600.00 per week during the second half of the year, after he joined the paper on a full-time basis. The Service did not challenge Mark Smith's compensation in 1974. Since he worked full-time throughout 1975, the Service cannot consistently allow less than a $600.00 per week salary as reasonable compensation. On an annual basis, this would equal $31,200. This amount will be allowed as a reasonable deduction by the Caledonian for 1975.

*Compensation to Barbara Smith in 1972–1973*

■ In 1971, Barbara Smith received total compensation of $6,350 for her services as copy editor. In 1972 and 1973 her base salary rose to $7,900, where it remained through 1975. In each of those years, she also received a bonus payment in the same amount as the other top level employees of the company, other than her husband and son. The government challenged the 1972 and 1973 total payments on the grounds that they represented increases disproportionate to those received by other non-shareholder employees. The court holds that the taxpayers have adduced evidence sufficient to carry their burden of demonstrating that the compensation received by Barbara Smith was not unreasonable. Testimony showed that Barbara Smith worked from 25 to 30 hours per week for the paper. The Service has stipulated to this fact. Barbara Smith also testified that her responsibilities increased between 1971 and 1972, and that she became responsible for more and more copy. The average basic salary of the Circulation

---

6. The Service, as well as the Tax Court and several circuit courts, has declined to follow the so-called automatic dividend rule, set down by the Court of Claims in *Charles McCandless Tile Service v. United States,* 422 F.2d 1336, 191 Ct.Cl. 108 (1970), in which the court held that even though compensation paid was not other-

wise unreasonable a portion of it necessarily constituted a dividend distribution where the corporation had a poor dividend history. *See, e.g., Nor-Cal Adjusters v. Commissioner,* 1971–200 T.C.M., aff'd, 503 F.2d 359 (9th Cir.1974); *Laure v. Commissioner,* 70 T.C. 1087, 1096–98 (1978).

Manager, Advertising Manager, Managing Editor, Mechanical Supervisor, and Business Department Manager was $11,556 in 1972 and $12,197 in 1973. These were apparently full time employees. In 1972 Barbara Smith's basic salary represented 68% of this average and in 1973 it represented 64% of the average. If she worked 25 hours per week, the minimum stipulated, she would have put in 62% of a forty-hour week. Her salary does not appear to be disproportionate or grossly inflated. The bonuses she received were comparable to those of other employees.

### Travel and Entertainment Expenses

In order to be deductible, expenditures for travel and entertainment must first be shown to be ordinary and necessary expenditures under 26 U.S.C. § 162, and second, must satisfy the criteria set forth in 26 U.S.C. § 274, and the regulations promulgated under that section. Section 274 does not serve to make any item deductible which cannot be demonstrated to be deductible under another provision of the Code; it is strictly a disallowance provision. 26 C.F.R. § 1.274–1.

In general, no deduction is allowed for activities of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to the active conduct of his trade or business. Under 26 U.S.C. § 274(d), the taxpayer is required to establish the business purpose of the expense by adequate records or evidence.

A purpose to create business good will will not meet the requirements of § 274:

[I]n entertaining these various individuals, it was the petitioner's purpose to create good will among customers or potential customers, and to cement business friendships and relationships. At one time this might have been enough to justify deduction of these expenses, but no longer. For taxable years after 1962,

the Congress has imposed very strict requirements [under § 274] upon the deduction of expenditures for entertainment.

*Leon v. Commissioner*, 1978–367 T.C.M. (CCH) ¶ 35,407(M).

In order to demonstrate the deductibility of an expenditure for an item generally considered to constitute entertainment, amusement, or recreation, the taxpayer must establish that the expenditure was either "directly related to" the active conduct of his trade or business, or, in the case of an expenditure directly preceding or following a substantial and bona fide business discussion, "associated with" the active conduct of the trade or business. 26 C.F.R. § 1.274–2(a)(1). In the instant case, the taxpayers make no claim that the two trips taken to Montreal preceded, followed, or contained any business discussions at all. The taxpayers must, therefore, demonstrate that the trips were "directly related" to the conduct of the business of the Caledonian.

Under 26 C.F.R. § 1.274–2(c)(2), entertainment is "directly related" if it meets the provisions of one of subsections (3)–(6) of paragraph 2(c). The most pertinent provision of subsection (5) provides:

An expenditure shall be considered directly related to the active conduct of the taxpayer's trade or business if it is established that the expenditure was made directly or indirectly by the taxpayer for the benefit of an individual (other than an employee), and if such expenditure was in the nature of compensation for services rendered or was paid as a prize or award which is required to be included in gross income under section 74 and the regulations thereunder. For example, if a manufacturer of products provides a vacation trip for retailers of his product who exceed sales quotas as a prize or award which is includible in gross income, the expenditures will be considered directly related to the active conduct of the taxpayer's trade or business.

The taxpayers contend that the expenses were "incurred by the Caledonian to provide recognition to these contributors who have made substantial contributions over the years to the Caledonian, without compensation." (Taxpayers' pre-trial memorandum, paper 23, pp. 29–30).

■■■ The taxpayers' claim fails for two reasons. First, the taxpayers have failed to meet the substantiation requirements of 26 C.F.R. § 1.274–5. They provide no records to substantiate the deductions claimed for the Montreal trips. Second, the expenditures fail to meet the threshold requirement that they be "ordinary and necessary" expenses incurred in the conduct of the taxpayer's trade or business under 26 U.S.C. § 162. Testimony at trial by H. Gordon Smith indicated that Dr. Silloway and Mr. Mold had consistently refused any compensation for their contributions to the paper. Payments made to satisfy moral obligations, however laudable, are not ordinary and necessary business expenses. *E.g., Welch v. Helvering, supra,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed.2d 212; *Montgomery Engineering v. United States, supra,* 344 F.2d 99. The trips were in personal appreciation on the part of H. Gordon Smith, the controlling shareholder of the corporation, to his friends to express his personal gratitude for sharing their hobbies with Caledonian subscribers. As such, the costs of the trips are includible in H. Gordon Smith's income for the years in question as constructive dividends.

### Conclusion

The tuition payments and moving expenses paid by the Caledonian on behalf of Mark Smith were non-deductible expenditures. The determination by the Service that only $3,000 per year of the compensation paid Mark Smith in 1971, 1972 and 1973 was reasonable compensation will be sustained. Tuition and non-deductible compensation paid to and on behalf of Mark Smith in the years 1971 through 1974 were gifts and are not includible in his taxable income for those years. Compensation paid to Barbara Smith in 1972 and 1973 was reasonable, and therefore deductible by the corporation. Compensation paid to Mark Smith in excess of $31,200 in 1975 and $34,000 in 1976 has not been shown by the taxpayers to be reasonable, and the disallowance of a deduction by the Caledonian for this excess will be sustained. The excess compensation in those years was properly included in Mark Smith's income as a dividend distribution. The two trips to Montreal taken by the H. Gordon Smith's, the Frederick Molds and the Frederick Silloways were not deductible as business expenses, and were correctly disallowed by the Service. The amounts expended on these trips were correctly included in the income of H. Gordon Smith as constructive dividends.

The foregoing memorandum shall constitute the findings and conclusions required by Fed.R.Civ.P. 52(a).

The parties will submit a proposed judgment order on or before November 1, 1983, in accordance with the views expressed in this opinion and their prior stipulation.[7] Costs will not be assessed against any party.

It is so ORDERED.

---

7. The parties agree that if the Court's decision results in a refund for any or all of the taxpayers, the amount of the refund shall be calculated by the Government, subject to the approval of the Plaintiffs. If the Plaintiffs do not approve such calculation, the matter shall be resolved by the Court.
Stipulation of Facts, paper 22, ¶ 96.